**SC TESTING TECHNOLOGY, INC., et al.**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION et al.**

Supreme Judicial Court of Maine.

Argued Sept. 5, 1996.

Decided Dec. 30, 1996.

Daniel Amory (orally), Barbara Appleby, Drummond Woodsum & MacMahon, Portland, Jeffrey A. Thaler (orally), Paul F. Macri, Berman & Simmons, P.A., Lewiston, for Plaintiffs.

Peter J. DeTroy (orally), Christopher C. Taintor, Norman, Hanson & DeTroy, Portland, for Defendants.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

ROBERTS, Justice.

SC Testing Technologies, Inc., along with its Maine subsidiary, Systems Control, Inc. (collectively SCI), appeals from a summary judgment entered in the Superior Court (Kennebec County, *Alexander, J.*) in favor of the Department of Environmental Protection (DEP) on SCI's action for contract damages. SCI argues that the trial court erred in granting a summary judgment because its interpretation of the underlying contract was erroneous and there exist genuine issues of material fact. We affirm the judgment.

## I.

In 1991 the Legislature enacted the Motor Vehicle Emissions Inspection Program. P.L. 1991, ch. 818, codified as 38 M.R.S.A. §§ 2401–2408 (Supp.1994). The program, part of a plan to comply with the federal Clean Air Act (CAA) Amendments of 1990, 42 U.S.C. §§ 7401–7671(q) (1995), was intended to reduce ozone emissions in seven counties: Androscoggin, Cumberland, Kennebec, Knox, Lincoln, Sagadahoc, and York. The legislation authorized the DEP to contract with a private entity to design, construct, equip, establish, and maintain emission inspection stations in each of the seven counties. The program was fine-tuned in 1993 by the enactment of a registration-based enforcement mechanism that required owners to present proof of compliance prior to vehicle registration. P.L.1993, ch. 418, codified as 29–A M.R.S.A. § 403 (Supp.1994). The program was to be financed entirely by the imposition on vehicle owners of an inspection fee, a portion of which would be retained by the private contractor.

In November 1992 the DEP began the process of selecting a contractor by issuing a Request for Proposals (RFP). In December 1992 the DEP held a proposer's conference, at which prospective contractors presented questions regarding specific aspects of the program and the RFP. Questions were also submitted directly to the DEP, which responded by providing written answers to all prospective bidders.

The proposer's conference and the submission of written questions revealed that a concern among prospective contractors was the potential economic effect of a legislative repeal of the program.[1] In February 1993

---

1. For example, prospective contractors submitted the following questions, which are followed by the State's answers:

[Question:] How will the Department structure compensation and or liquidated damages to the Contractor in the event of replacement

the DEP issued an amended RFP. Section 5.N of that document, entitled "Replacement of the Contractor," concluded with the following language:

Note: In the event the Maine Legislature repeals all or part of the program, the Department and the State of Maine shall bear no responsibility to compensate the Contractor.

Thereafter, SCI submitted a proposal and was awarded the contract the following April. Contract negotiations between the DEP and SCI concluded with a final agreement that became effective on February 4, 1994. During the course of negotiations, the DEP repeatedly refused to agree to contract terms that would have partially compensated SCI for its investment in the event of legislative repeal of the program. Specifically, the DEP rejected contract language that would have compensated SCI for its investment in the event of termination of the contract for the State's convenience. The DEP also rejected proposed language that would have permitted SCI to treat repeal of the program as a change in the scope of the work of the contract, for which SCI could seek compensation by way of a contractual amendment.

The substantive provisions of the contract between SCI and the DEP were contained in an attached rider referred to as Rider A. Much of Rider A's language closely tracked the amended RFP, and certain of its provisions were explicitly incorporated by reference into the contract. SCI's proposal, approximately 1000 pages in length, was explicitly incorporated by reference into Rider A. Neither Rider A nor SCI's proposal contains the language of section 5.N of the amended RFP, allocating to the contractor the economic risk of repeal of the program.

Section AA of Article I of Rider A dealt with potential conflicts between language contained in Rider A and elsewhere. Section AA provided:

*Conflicts.* This Contract shall control in the event of any conflict between the provisions hereof and the provisions of either the RFP or the Proposal. Furthermore, only as between the RFP and the Proposal, the RFP shall control in the event of any conflict between the provisions of the RFP and the provisions of the Proposal.

In anticipation of the program's July 1, 1994, start-up date, SCI established inspection facilities in the seven Maine counties. Motor vehicle inspections occurred as scheduled during July and August of 1994, but implementation of the plan generated sharp public criticism. In response, on September 1, 1994, the DEP and SCI signed a memorandum of agreement suspending mandatory emissions testing from that date until March 1, 1995. During that period, testing would be strictly voluntary and the inspection fee would be reduced.

On February 28, 1995, prior to the resumption of mandatory emissions testing, the Legislature enacted P.L.1995, ch. 6, which suspended registration-based enforcement of the program from March 1 until May 1, 1995. The program was permanently repealed effective April 26, 1995, through the enactment of P.L.1995, chs. 49 and 50.

In May 1995 SCI filed a complaint against the DEP alleging, *inter alia,* a breach of contract and a breach of the implied duty of good faith and fair dealing. The court entered a summary judgment in favor of the DEP, finding that the contract allocated to SCI the entire risk of loss in the event of repeal of the program.

prior to the expiration of the Contract? Will the State discriminate between a supplantation for the convenience of the State, or repeal of the program and replacement necessitated by Contractor default? In the case of repeal or supplantation for the convenience of the State, will the State pay all Contractor costs and an additional amount to compensate the Contractor for inability to obtain a fair return on its investment?
[Answer:] The State of Maine cannot guarantee compensation in the event of Contractor

replacement prior to the expiration of a contract.
[Question:] What kinds of protection can/will the Administration provide contractually for the bidder in the event the legislature reduces the program ... or shortens it ... or even cancels it?
[Answer:] None. . . .
[Question:] Will the Administration offer "change in law or regulation" protection?
[Answer:] No.

## II.

SCI argues that the trial court erred in construing the contract to place on SCI the entire risk of loss in the event of legislative repeal of the program. On an appeal from a summary judgment, we view the evidence in the light most favorable to the party against whom the judgment was entered to determine whether the record supports the trial court's conclusion that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Simpson v. Central Maine Motors, Inc.*, 669 A.2d 1324, 1325–26 (Me. 1996).

The trial court found that the risk-of-repeal note contained in section 5.N of the amended RFP was incorporated into the express agreement between SCI and the DEP by means of Rider A's conflicts clause, section AA of Article I. The court determined that the conflicts clause was unambiguous, and that its purpose was to incorporate into the contract those provisions of the amended RFP that did not conflict with the provisions of Rider A. Thus, because Rider A was silent as to the risk of loss in the event of the repeal of the program, and because nothing in Rider A conflicted with the allocation of risk expressed in the risk-of-repeal note contained in section 5.N, that note was to be read as part of the contract. In effect, the trial court concluded, the contract between SCI and the DEP was composed of Rider A, those provisions of the amended RFP that were not addressed in Rider A and that did not conflict with it, and those parts of SCI's proposal that did not conflict with either.

"[T]he paramount principle in the construction of contracts is to give effect to the intention of the parties as gathered from the language of the agreement viewed in light of all the circumstances under which it was made." *Lynch v. Ouellette*, 670 A.2d 948, 949 (Me.1996). When the language of a contract is not ambiguous, the contract's interpretation is a question of law for the court. *F.O. Bailey Co. v. Ledgewood, Inc.*, 603 A.2d 466, 468 (Me.1992). We agree with the trial court that the conflicts clause contained in Rider A expresses a clear intention on the part of SCI and the DEP to incorporate into their agreement those provisions of the amended RFP that were not addressed in Rider A and that did not conflict with it. Otherwise, the parties' reference to the amended RFP in the conflicts clause would be meaningless. In construing a contract, we should avoid an interpretation that renders meaningless any particular provision in the contract. *Top of the Track Assocs. v. Lewiston Raceways, Inc.*, 654 A.2d 1293 (Me. 1995). Thus, the risk-of-repeal note contained in section 5.N of the amended RFP was incorporated in the contract by the operation of the conflicts clause. This interpretation of the contract gives effect to the unambiguous intention of the parties, as shown both by the language of the conflicts clause and the circumstances surrounding their agreement, that SCI would bear the risk of loss in the event the Legislature repealed the program.

The contract between SCI and the DEP allocated to SCI the risk of legislative repeal of the program. Moreover, when a party enters into a contract with a state agency, it does so with the understanding that the Legislature may at some future time take action that nullifies the subject matter of the contract and, necessarily, the respective performance obligations of the parties. "The Legislature of Maine may enact any law of any character or on any subject, unless it is prohibited, either in express terms or by necessary implication, by the Constitution of the United States or the Constitution of this State." *League of Women Voters v. Secretary of State*, 683 A.2d 769, 771 (Me. 1996) (quoting *Baxter v. Waterville Sewerage Dist.*, 146 Me. 211, 215, 79 A.2d 585, 588 (1951)).

In *KHK Assocs. v. Department of Human Servs.*, 632 A.2d 138 (Me.1993), KHK was awarded a contract to lease a building to the Department of Human Services for ten years. Relying on the lease, KHK constructed a building to the Department's specifications. During the first year of the lease, the Legislature, in response to budgetary constraints, enacted legislation reducing the appropriation for the KHK lease and requiring its renegotiation. The parties were unable to renegotiate successfully and the Department terminated the lease, whereupon KHK sued

for a breach of the lease. The lease provided that the State's performance was "subject to available budgetary appropriations." In *KHK Associates,* we recognized that although KHK and the State entered into a contractual agreement, that agreement was nonetheless subject to the exercise of legislative power, which could deprive the parties of the benefit of their contract. Similarly, in the case at bar the agreement between SCI and the DEP was always subject to the possibility that the Legislature might exercise its power to repeal mandatory emissions testing at any time, thus destroying the subject matter of the agreement. Moreover, nowhere in the contract does the State affirmatively undertake to maintain the Program for any length of time.

◼◼◼ SCI argues that the State made two affirmative representations that the program would remain in place. First, the law creating the program, which authorized the DEP to enter into the contract with SCI, provided that "[c]ontracts must require the contractor to operate the public emission inspection stations for a minimum of 5 years...." 38 M.R.S.A. § 2404(2) (Supp. 1994). Second, in a memorandum dated October 1, 1993, in which the DEP responded to the first draft contract presented by SCI, a DEP negotiator stated that he could not "anticipate any contingency causing [the DEP] to voluntarily terminate the Contract *except* for Contractor's default."

◼◼◼ SCI misapprehends the meaning of both of these actions. With regard to the language in the statute, it simply meant that any contractor selected by the DEP to administer the program would have to agree to do so for a minimum period of time sufficient to ensure program continuity. The provision in no way guaranteed, nor could it, that the legislation authorizing the program would not be repealed by a subsequent legislature. The Legislature may not enact a law that purports to bind a future Legislature. *See Opinion of the Justices,* 673 A.2d 693, 695 (Me.1996). With regard to the statement by the DEP's negotiator, it amounts to little more than an equivocal prediction about the future. In any event, the DEP would be in

no better position than the Legislature itself to bind future Legislatures. *Id.*

The entry is:

Judgment affirmed.

LIPEZ, Justice, dissenting.

Because I cannot find any language in the contract between SCI and the DEP to support the Court's interpretation of the contract, I respectfully dissent. The Court is correct that the risk of legislative repeal of the emissions inspection program was a major point of contention during the contract negotiations. Given the focus on this point, the failure of the parties to finalize a contract that clearly addressed this important issue is remarkable. Yet that failure is unmistakable.

The first sentence of the "Conflicts" clause sets forth a deceptively simple proposition: "This Contract shall control in the event of any conflict between the provisions hereof and the provisions of either the RFP or the Proposal." That language suggests that the "contract" provisions are distinct from two other documents, the amended RFP and the Proposal, and in the event of a conflict between the contract provisions and either the amended RFP or the Proposal, the contract controls. In reality, however, the Contract consists of Rider A, a seventy-page document attached to a signature page. Far from being a document distinct from either the amended RFP or the Proposal, Rider A, and hence the contract, includes:

1. The Proposal itself, specifically incorporated into the contract by reference.

2. Nine sections of the amended RFP incorporated by reference.

3. Other amended RFP provisions copied verbatim.

4. Modified amended RFP provisions.

There can be no conflict between the contract and the amended RFP or the Proposal because the contract *is* the Proposal and selected portions of the amended RFP. Moreover, there is no express language incorporating the entire amended RFP into the contract by reference, and hence no express

incorporation of the repeal provision of the amended RFP into the contract.

In the absence of express language of incorporation relating to the amended RFP, the Court inappropriately transforms the conflicts clause of Rider A into an incorporation clause by holding that "the parties' reference to the amended RFP in the conflicts clause would be meaningless" without the incorporation of the entire RFP into the contract. The Court further concludes that "Rider A expresses a clear intention on the part of SCI and the DEP to incorporate into their agreement those provisions of · the amended RFP that were not addressed in Rider A and that did not conflict with it." Using a conflicts clause intended to resolve conflicts between documents, the Court cites the absence of conflict between documents to achieve wholesale incorporation of amended RFP provisions into the contract, including the repeal provision. This interpretation strains logic and the language of the contract.

I do not know what the parties intended by the reference in the first sentence of the conflicts clause to the amended RFP. SCI's legal arguments on this issue are no more persuasive than the State's. There is an inescapable ambiguity in that reference to the RFP which precludes the entry of summary judgment for either party. "Where there is an ambiguity in a written contract, and the record does not completely eliminate the possibility of an issue of material fact concerning the intent of the parties, summary judgment is inappropriate." *Tondreau v. Sherwin–Williams*, 638 A.2d 728, 730 (Me. 1994).

The legal consequences of this ambiguity are not avoided by the Court's application of the unmistakability doctrine. This doctrine, developed in federal case law, recognizes a presumption that when a sovereign government enters into a contract, it does not intend to limit its ability to make its own performance impossible by means of a future sovereign act. "[S]overeign power ... governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Bowen v. Public Agencies Opposed to Social Securi-*

*ty Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1986) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)). The Court asserts Maine's version of the doctrine in these terms: "... when a party enters into a contract with a state agency, it does so with the understanding that the Legislature may at some future time take action that nullifies the subject matter of the contract and, necessarily, the respective performance obligations of the parties." According to the Court, this understanding governed the contract between SCI and the DEP because "nowhere in the contract does the State affirmatively undertake to maintain the Program for any length of time."

The United States Supreme Court recently applied the unmistakability doctrine in *United States v. Winstar*, —— U.S. ——, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). During the savings and loan crisis of the 1980s, the Federal Home Loan Bank Board sought to encourage healthy thrifts and outside investors to take over ailing thrifts. As an inducement to act, the board agreed to permit acquiring entities to use certain accounting techniques in calculating capital reserves, the minimum levels of which were mandated by federal regulations. Subsequently, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act, which forbade thrifts from using the above-mentioned accounting techniques. Three affected thrifts brought suit for breach of contract. Although unable to agree on an opinion, seven members of the Supreme Court agreed that the United States was liable to the three thrifts in damages, and four members concluded that "application of the [unmistakability] doctrine ... turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government." *Id.* at ——, 116 S.Ct. at 2457 (Souter, J., plurality opinion). Working from that principle, the plurality concluded that the unmistakability doctrine should not bar government liability on the contracts at issue because they could be enforced without effectively limiting sovereign authority.

I agree with the position of the plurality in *Winstar*. As in *Winstar*, the contractual obligations at issue in this case could be enforced without limiting the State's sovereign authority to act now or in the future. The Court's application of the unmistakability doctrine wrongly equates the State's need to protect its sovereign power to act with its ability to abrogate contracts without exposure to damage claims.

The Government took this position in *Winstar*, arguing that any award of substantial damages against the government for "breach of contract through a change in the law 'unquestionably carries the danger that needed future regulatory action will be deterred,' and thus amounts to an infringement on sovereignty requiring an 'unmistakable' promise." —— U.S. at ——, 116 S.Ct. at 2475 (quoting Brief for Petitioner). As Justice Breyer noted in his concurring opinion in *Winstar*:

> [T]his rationale has no logical stopping point.... It is difficult to see how the Court could, in a principled fashion, apply the Government's rule in this case without also making it applicable to the ordinary contract case ... which ... [is] properly governed by ordinary principles of contract law. To draw the line—i.e., to apply a more stringent rule of contract interpretation—based only on the amount of money at stake, and therefore (in the Government's terms) the degree to which future exercises of sovereign authority may be deterred, seems unsatisfactory.

—— U.S. at ——, 116 S.Ct. at 2475. In his plurality opinion, Justice Souter warned that broad application of the unmistakability doctrine could impair an important aspect of sovereignty:

> Injecting the opportunity for unmistakability litigation into every common contract action would ... produce the untoward result of compromising the Government's practical capacity to make contracts, which we have held to be 'of the essence of sovereignty' itself. From a practical standpoint, it would make an inroad on this power, by expanding the Government's opportunities for contractual abrogation, with the certain result of undermining the Government's credibility at the bargaining table and increasing the cost of its engagements.

—— U.S. at ——, 116 S.Ct. at 2459 (quoting *United States v. Bekins*, 304 U.S. 27, 51–52, 58 S.Ct. 811, 815–16, 82 L.Ed. 1137 (1938)). Absent special circumstances I do not find present here, the State's interests are best served by subjecting it to the same principles of contract law applicable to private parties. That application imposes no undue burden. The State would simply have to rely on the drafting of clear contract language, rather than legal presumptions, to protect its interests.

I would vacate the summary judgment and remand this matter to the Superior Court for inquiry by a factfinder into the intent of the parties on the risk of repeal.