USCA1 Opinion

 

[NOT FOR PUBLICATION-NOT TO BE CITED AS PRECEDENT]

United States Court of Appeals

For the First Circuit

No. 99-1593

ABINGTON CONSTRUCTORS, INC.,

Plaintiff, Appellee,

v.

MADISON PAPER INDUSTRIES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Eugene W. Beaulieu, U.S. Magistrate Judge]

Before

 Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Boudin, Circuit Judge.

 Charles Harvey for appellant.

 John H. Montgomery with whom Daniel J. Mitchell was on brief
for appellee.

March 21, 2000

 COFFIN, Senior Circuit Judge. Defendant-appellant Madison
Paper Industries appeals from a decision of the district court
granting plaintiff-appellee Abington Constructors, Inc. quantum
meruit relief for extra-contractual construction work. Applying
Maine law in this diversity case, we conclude that quantum
meruit recovery is not precluded by the existence of an express
contract between the parties and that the evidence permitted the
court to find that the elements of quantum meruit existed. We
therefore affirm the judgment.

I. Background

 Neither party challenges the district court's factual
findings and we therefore borrow liberally from its rendition of
the facts. See Abington Constructors, Inc. v. Madison Paper
Indus., Civ. No. 98-0048-B (D. Me. Mar. 31, 1999). Madison is
the owner and operator of Anson Dam, a hydroelectric facility on
the Kennebec River in central Maine, which consists of a dam, a
waste gate, and a power station. In May 1996, Madison requested
bids on a project to reconstruct the Anson Dam waste gate and
repair the power station. In order to conduct the repairs, both
an "upstream" and a "downstream" cofferdam (an enclosure from
which water is pumped to allow construction on the exposed
bottom of a body of water) were necessary because much of the
work would be done below the water level of the river. The
downstream cofferdam was located in a "tail pond" into which
water flowed after passing under the power station and turning
the turbines. 

 The project manual that Madison provided to bidders
contained a "Form of Contract" (FOC) (an agreement to be signed
by Madison and the chosen contractor), conditions to the FOC,
technical specifications, and a list of contract drawings. The
FOC stated that a bidder could rely on "the general accuracy of
the 'technical data'" in the materials but authorized only
"limited reliance" on drawings. 

 The bidding instructions informed prospective bidders that
they would be granted access to the site to perform any
necessary testing and placed responsibility on the bidder to be
familiar with the site terrain. When Abington visited the site
to conduct an inspection, the river flows were too high for it
to survey the river. When Madison's project manager later
invited Abington to revisit the site, Abington declined. 
Relying on water flow and bottom elevation data in the project
manual, Abington submitted what turned out to be the lowest bid,
agreeing to do the work for $808,500. 

 In its bid form, Abington represented as follows:

 BIDDER has obtained and carefully studied (and assumes
responsibility for obtaining and carefully studying)
all such examinations, investigations, site visits,
explorations, tests and studies . . . which pertain to
the subsurface or physical conditions at the site or
otherwise may affect the cost, progress, performance
or furnishing of the Work as BIDDER considers
necessary for the performance or furnishing of the
Work at the Contract Price, within the Contract Time
and in accordance with the other terms and conditions
of the Contract Documents . . . .

Although the FOC had been included in the project manual, the
parties agreed to forego the FOC and instead Madison issued a
purchase order to Abington to signal its acceptance of
Abington's bid, creating a contract. The purchase order
referenced the project manual as well as Abington's bid form in
describing the work to be performed. The district court found
that the parties intended the purchase order to act as a
substitute for signing the FOC and that there was mutual assent
to incorporate the project manual and the bid form. The court
also found that Abington committed a breach, although not in bad
faith, by failing to conduct its own investigation.

 Before constructing the downstream cofferdam, Abington
investigated the contour of the relevant area of river bottom. 
The project manual drawings recorded the average level of the
tail pond to be 222.65 feet above sea level, although it was
actually 223.65 feet above sea level on average. Further, the
drawings did not reveal several deep contours in the area where
the cofferdam was to be constructed. The design for the
cofferdam was created by a professional engineer retained by
Abington and approved by an engineering firm employed by
Madison.

 In July 1996, Abington began construction of the downstream
cofferdam and was forced to use 300 bulk bags filled with sand
and 5000 smaller bags, rather than the 180 bulk bags and 250
smaller bags it had initially allocated, due to water levels and
river bottom configurations that were different from
specifications in the project manual. The route of the
cofferdam also had to be altered due to the river bottom
configuration. The cofferdam stood between 224 and 226 feet
above sea level and a liner was placed over the bags to prevent
leaks.

 When Abington first noted the discrepancies between the site
measurements and their specifications in the project manual, it
conveyed to Madison its fears that surmounting these obstacles
would create additional costs. It later memorialized its
concern in a letter to Madison stating that it was compiling the
costs associated with overcoming the unexpected conditions and
requested that a change order be issued. Madison, however, did
not respond. To further complicate matters, over the next
several months a series of floods caused extensive delay on the
project. The FOC provided that when high water flows caused
delay, Abington would be granted an extension of time equal to
the length of the delay. The FOC placed responsibility for any
overtopping of the cofferdams due to the high water flows on the
contractor: "If river elevations increase to the extent that the
cofferdams are overtopped and construction areas are flooded,
the Owner will assume no responsibility for flooding." 
Nevertheless, prior to awarding Abington the project, Madison
issued an addendum ("Addendum I"), stating that "[i]n the
unlikely event of a major flood, [Madison] will pay the direct
replacement costs of coffer dams provided coffer dams have been
completed and approved by [Madison] prior to flooding. . . . 
Downstream coffer to be constructed to elevation 226.25."

 From August to October, a series of interactions between the
parties occurred in which Madison indicated that it would cover
some, if not all, of the additional costs caused by the faulty
specifications and high water flows. Madison's project
engineer, Steve Small, told Abington's project manager, John
Tardif, that it would assume responsibility for the direct costs
of future overtopping if Abington spared the cost of placing
additional bulk bags on the cofferdam. The court found that
although this did not constitute a formal agreement, Abington
relied on this statement in continuing to work on the project
during subsequent high water flows even though it was entitled
to delay performance under the terms of the contract. By mid-October it was working seven days a week in hopes of completing
the project on schedule.

 Abington also sent Small a written memo entitled "Confirm
Verbal Agreements," seeking a change order and reiterating
Abington's position that the costs associated with repairs and
dewatering of the site due to the previous flooding would be
covered by Madison pursuant to Addendum I of the contract,
although the memo inadvertently referred to Addendum II rather
than Addendum I.(1) In response, Small signed the document but
circled "covered under Addendum II" and wrote "No as mutually
agreed upon by [Madison] and Abington," in reference to his
discussion with Tardif.

 October construction meeting minutes show that Madison was
awaiting the submission by Abington of its cost overruns. 
Abington subsequently submitted documentation that it had
incurred $180,000 in additional costs. Small then cautioned
Tardif that he was not authorized to approve the amount and that
new management might not be willing to pay all the additional
costs. Small nevertheless reiterated that Madison wanted to be
fair but was concerned that Abington was not assuming adequate
responsibility for its share of the additional costs. Moreover,
at several subsequent construction meetings, Madison indicated
either that it was reviewing the cost overruns or that they
would be dealt with at the end of the job, never stating that it
refused to pay. Madison's internal documents from this period
show that it planned to set aside $100,000 for anticipated extra
costs. 

 Madison's interest in completing the job on schedule stemmed
from the fact that it stood to gain approximately $300,000
annually from the completion of both phases of the construction
at Anson Dam, the first of which was the repair work being
performed by Abington. The project was eventually completed at
the end of January 1997. 

 Abington incurred $404,738 in disputed costs above budget. 
After assuming responsibility for over $121,000 in costs,
Abington claimed $283,680 from Madison in costs and an
additional 17.8% allowance, or $50,495, for overhead and profit,
for a total of $334,175. Abington's complaint suggested a
number of theories of liability including quantum meruit, unjust
enrichment, mutual mistake, impracticability, and breach of
contract. The district court found that although the parties
had a contractual agreement, Abington was entitled to quantum
meruit recovery for the additional work and costs resulting from
the defects in the data in the project manual combined with high
water flows which were the subject of post-contractual
communications between the parties. It granted Abington an
award of $334,175, the reasonable value of its services, but did
not reach Abington's remaining theories of liability.

 Madison appeals, contending that quantum meruit recovery is
not available under Maine law when the parties have negotiated
a contractual agreement and, even if it were available, the
predicate elements for quantum meruit recovery are not found in
this case.

II. Discussion

 The principal issue before the district court was whether
a contract existed between the parties. The district court
found, and neither party protests on appeal, that the purchase
order constituted a written contract that included by reference
the project manual and the bid proposal. Given that, the
district court concluded that: "[the] contract . . . placed the
risk of high water flows, the variable elevation of the tail
pond, and conditions of the river bottom on Abington." 
Nevertheless, the district court held that Abington was entitled
to quantum meruit relief because Madison created the reasonable
expectation that Abington would be paid for the cost overruns
and Abington did not delay work during the high flow periods,
despite its contractual right to do so. Madison challenges
primarily this aspect of the decision, arguing that the written
contract governed the situation and thus a quantum meruit remedy
is unavailable to Abington. Because this is an issue of law, we
review it de novo. See United States v. Cunningham, 113 F.3d
289, 291 (lst Cir. 1997). 

 A. Availability of Quantum Meruit Recovery

 In urging their respective positions on the availability of
quantum meruit relief, the parties each rely on a district court
decision that is in direct conflict with the other. Madison
relies on an unreported 1995 decision of the district court,
holding that under Maine law, "without a breach of contract,
fraud or other circumstances that render the contract
inoperative, [a party to a contract] is foreclosed from seeking
additional payment outside the contract terms under his quantum
meruit or unjust enrichment theories." Hodgkins v. New England
Tel. and Tel. Co., Civ. No. 94-231-P-H, 1995 WL 431390, at *4
(D. Me. July 6, 1996), aff'd in part and rev'd in part, 82 F.3d
1226 (lst Cir. 1996). In particular, Madison makes the point
that one cannot obtain quantum meruit relief where a written
contract explicitly covers the contested issue.

 Taking the opposite stance, Abington contends that under
Maine law a contract implied in fact, allowing quantum meruit
relief, may indeed exist alongside an express contract. 
Abington relies heavily on another district court decision
holding that although some states bar recovery in quantum meruit
"when a valid written agreement covers the construction work at
issue . . . the Maine Law Court has not set forth such an
absolute rule." Combustion Eng'g v. Miller Hydro Group, 812 F.
Supp. 260, 262 (D. Me. 1992), aff'd, 13 F.3d 437 (lst Cir.
1993).

 In Combustion Engineering, after a jury found that a
contract existed and that both parties had committed breaches,
but that neither party was entitled to damages, the district
court held that Maine law did not prohibit equitable relief
under quantum meruit, unjust enrichment, or promissory estoppel
theories. See id. at 262.(2) The court held that although other
jurisdictions did so, Maine did not bar quantum meruit relief
when a valid written agreement covered the work at issue, but
declined to award such recovery to the plaintiff who had not
only breached the contract but also made fraudulent
misrepresentations and omissions. See id. at 262, 264.(3) 

 Both district court decisions cited state precedents. We
now examine the state authority, beginning with the cases relied
on in Combustion Engineering, which, with one exception, cited
older cases than those referenced in Hodgkins. The court in
Combustion Engineering took note of Aroostook Valley Railroad
Co. v. Bangor & Aroostook Railroad Co., 455 A.2d 431 (Me. 1983),
in which the court held that "[w]hen two parties have agreed
upon specific and unambiguous terms of compensation for
specified services by means of an express contract, . . . the
law should be most hesitant to imply a second contract, which
covers the same subject matter, if the evidence does not compel
an inference that the parties intended to make one." Id. at 433
(emphasis added) (rejecting plaintiff's claim that negotiations
entered into subsequent to the contract superimposed an implied
obligation to renegotiate the contract). Aroostook Valley
leaves the door open for recovery based upon the parties'
supplementation of an existing contract. The court also took
note of Gosselin v. Better Homes, Inc., 256 A.2d 629 (Me. 1969),
in which the court permitted recovery for the fair and
reasonable value of services when an express construction
contract was not fulfilled, because the constructor breached his
"implied obligation to perform in a reasonably skilful and
workmanlike manner," but the buyer had received and accepted the
benefit of construction. See id.  at 640.

 In Hodgkins, the district court grappled with the
contractual and quasi-contractual claims of an employee who had
come up with a cost-saving idea for his company through an
employee reward program. See Hodgkins, 1995 WL 431390, at *4. 
The court then held that the employee was ineligible for quasi-contractual recovery because a contract existed, relying on
several Maine cases, namely, Top of the Track Associates v.
Lewiston Raceways, Inc., 654 A.2d 1293 (Me. 1995); Jordan v.
Boothbay Region Refuse Disposal District, 656 A.2d 740 (Me.
1995); and Prest v. Inhabitants of Farmington, 104 A. 521 (Me.
1918).(4)

 In Top of the Track, the court held, without citation, that
a contract between the parties necessarily foreclosed the
plaintiff's claim for unjust enrichment, although claims for
quantum meruit were not asserted. See Top of the Track, 654
A.2d at 1296. In Jordan, decided one month after Top of the
Track, the court denied an unjust enrichment claim on the basis
that the defendant had not been unjustly enriched, seemingly
entertaining plaintiff's claims even though a contract existed
between the parties. See Jordan, 656 A.2d at 742. These cases
are of limited application, however, due to the Maine court's
painstaking efforts to differentiate between unjust enrichment
and quantum meruit. 

 The court has repeatedly explained that "quantum meruit,
also sometimes labelled 'contract implied in fact,' involves
recovery for services or materials provided under an implied
contract"; unjust enrichment, on the other hand, "describes
recovery for the value of the benefit retained when there is no
contractual relationship, but when, on the grounds of fairness
and justice, the law compels performance of a legal and moral
duty to pay." Paffhausen v. Balano, 708 A.2d 269, 271 (Me.
1998); see also Danforth v. Ruotolo, 650 A.2d 1334, 1335 n.2
(Me. 1994); Aladdin Elec. Assocs. v. Town of Old Orchard Beach,
645 A.2d 1142, 1145 (Me. 1994); A.F.A.B., Inc. v. Town of Old
Orchard Beach, 639 A.2d 103, 105 n.3 (Me. 1994). The court has
also explained that its prior use of the term "quasi-contract"
as a blanket label for both unjust enrichment and quantum meruit
claims was misleading because it suggested that quantum meruit
recovery is not based on contractual principles. 
See Paffhausen, 708 A.2d at 271 n.3 (citing Danforth, 650 A.2d
at 1335).(5)

 The final case cited in Hodgkins, Prest, deserves a
particularly careful reading because it encompasses two separate
ideas. In Prest, the court held that a sewer contractor, who
had incurred extra costs during construction, was not entitled
to recover on the theory of indebitatus assumpsit based on
alleged misrepresentations by the defendants. See Prest, 104 A.
at 523-24. This was so because the contractor had agreed to do
the work at a specified sum and when he discovered the alleged
fraud of the defendants, he was entitled to repudiate the
contract and sue for deceit, but he did not do so. See id. at
523 ("By bringing the action in assumpsit, the plaintiff
affirmed the contract."). The court held that "[w]here a party
agrees to do work at a specified sum under a fraudulent
representation, he can only recover, in an action of indebitatus
assumpsit, according to the terms of the contract, although,
when he discovered the fraud, he might have repudiated the
contract and sued for deceit." Id.

 Nevertheless, and most significantly for this case, the
court in Prest also held that certain extra costs incurred by
the plaintiff were recoverable. See id. at 524-25. The court
found that where there was evidence that the defendants directed
the plaintiff to perform extra-contractual work the plaintiff
was entitled to recover. Whereas the plaintiff's indebitatus
assumpsit claim was denied on the basis that it had been brought
under a form of action recognizing a contract and was based on
allegations of fraud, his claims for costs of extra work,
including work that was the subject of the original agreement,
incurred at the behest of defendants and with their knowledge,
were entertained and in some instances allowed. See id. at 523-25. In other words, the Maine court implicitly recognized that
a quantum meruit claim could properly co-exist with a written
contract.

 In short, none of the cases relied on by the district court
in Hodgkins forecloses the possibility of quantum meruit relief
even though the parties have entered into a contract.(6) Further,
both Prest and Aroostook Valley provide authority for the
proposition that extra-contractual recovery may be had even when
an express contract covers the subject matter, if the evidence
allows.

 A leading practice manual echoes this point:

 The fact that two parties have entered into an
express contract for goods, labor, or services does
not necessarily limit them to traditional contract
remedies against each other. . . . 

 . . . .

 If one party to the express contract does more
than is required under the contract, and the other
party accepts the benefit of the extra work or
materials, the first party is entitled to recover the
fair and reasonable value of the extra performance.

Andrew M. Horton & Peggy L. McGehee, Maine Civil Remedies § 11-2(a)(2), at 249-50 (3d ed. 1996) (footnotes omitted). We note
recognition of the principle that parties may create extra-contractual understandings outside the context of Maine law in
Professor Corbin's treatise on contracts. In a section entitled
"Effect of an Express Promise in Excluding the Implication of a
Different One," he writes:

 The statement is frequently found that where the
parties have made an express contract the law will not
imply one. This is a misleading statement, even
though some truth is concealed within it. It is more
accurate, even though not very useful as a working
rule to say that where the parties have made an
express contract, the court should not find a
different one by 'implication' concerning the same
subject matter if the evidence does not justify an
inference that they intended to make one. . . . [T]he
fact that an express contract has been made does not
prevent the parties from making another one tacitly,
concerning the same subject matter or a different one. 
Further, innumerable cases show that the fact that a
contract has been put into express words does not
prevent the meaning and legal operation of those words
from being affected by the process of 'implication'
from the conduct of the parties and from surrounding
circumstances.

3 Arthur Linton Corbin, Corbin on Contracts § 564, at 292-95
(1960) (emphasis added) (footnotes omitted) (collecting cases).
Corbin further notes that such modifications occur frequently in
the construction setting:

 It is very common in building transactions for the
parties to execute a detailed and formal contract and
yet to vary the plans and specifications as the work
proceeds. The claims to compensation are ample
evidence of this. If such extra work is requested or
authorized by the owner or his engineer, payment must
be made for it even though no promise to pay was made
in express words. 

Id. at 296.

 We thus believe that, at this time, Maine law permits
Abington's claim for quantum meruit relief. Although the Maine
court has sensibly noted that "courts should not re-write
contracts, particularly commercial agreements between two
corporations of equal bargaining strength," Aroostook Valley,
455 A.2d at 433, in this case the parties, not the court,
altered their relationship in response to changed conditions. 
The hurdle is high, but if good faith efforts in the field to
meet such conditions and get on with the job could always be
trumped by the original written contract, the arteries of
commerce, particularly in construction, would harden.

 We add a final observation. The district court concluded
that Maine law requires good faith to recover in quantum meruit. 
See Carvel Co. v. Spencer Press, Inc., 708 A.2d 1033, 1036 n.2
(Me. 1998) ("Carvel's failure to perform in good faith bars it
from recovery in quantum meruit." (citing Levine v. Reynolds, 54
A.2d 514, 517 (Me. 1947))). Nevertheless, the district court
found that Abington's breach, not properly inspecting before
bidding, was not committed in bad faith, and its "overall
performance" throughout the term of the contract was "very
good," according to Madison documents. Merely because a party
commits a breach does not mean that it cannot recover if it has
acted in good faith. See, e.g., Loyal Erectors, Inc. v.
Hamilton & Son, Inc., 312 A.2d 748, 756 (Me. 1973) (equitable
recovery may be allowed if plaintiff provided services "in an
honest endeavor" to perform the contract even though plaintiff
did not complete performance); Gosselin, 256 A.2d at 640 ("Where
[the defendant breached] its implied obligation to perform in a
reasonably skilful and workmanlike manner, but the plaintiff
received the benefit of the house, accepted it and uses the
same, the defendant-contractor is entitled to receive a fair and
reasonable value for the services performed . . . ." (citing
Rockland Poultry Co. v. Anderson, 91 A.2d 478 (Me. 1952);
Norris v. School Dist. No. 1, 12 Me. 293 (1835); Jewett v.
Weston, 11 Me. 346 (1834))).

 B. Elements of Quantum Meruit

 Under Maine law, a quantum meruit claimant must show that:
"(1) services were rendered to the defendant by the plaintiff;
(2) with the knowledge and consent of the defendant; and (3)
under circumstances that make it reasonable for the plaintiff to
expect payment." Bowden v. Grindle, 651 A.2d 347, 351 (Me.
1994). "While the formalities of an express contract are not a
prerequisite to recovery in quantum meruit, there must be a
reasonable expectation on the part of the claimant to receive
compensation for his services and a 'concurrent intention' of
the other party to compensate him." Paffhausen, 708 A.2d at
272. 

 We review the district court's decision that the elements
of quantum meruit were present in this case for clear error. 
See, e.g., Crellin Tech. v. Equipmentlease Corp., 18 F.3d 1, 7
(lst Cir. 1994) (whether contract has been formed between two
parties is question of fact); Gel Sys., Inc. v. Hyundai Eng'g &
Constr. Co., 902 F.2d 1024, 1027 (lst Cir. 1990) (party's
intention to contract is question of fact). Madison contends
that as a matter of law Abington could not have had a reasonable
expectation of payment and relies on Paffhausen to argue that we
must review the district court's findings with respect to the
elements of quantum meruit de novo because they constitute the
application of law to facts. We disagree. Paffhausen involved
a de novo review of the lower court's misunderstanding of the
elements of quantum meruit and its resultant misapplication of
the law to the facts. See Paffhausen, 708 A.2d at 272. In this
case, there is no asserted error of law.

 C. Sufficiency of Evidence Supporting Court's Award

 Regarding the first element of quantum meruit, Madison
denies that services were rendered to it by Abington. Madison
argues that quantum meruit services must have value to the
receiving party, citing Carvel Co., 708 A.2d at 1036, and that
it did not retain any value from the additional work performed
by Abington. 

 It is clear, however, that Madison stood to gain additional
profit as soon as the construction was completed and that it
readily encouraged Abington to complete the job as soon as
possible. As the district court found, "[t]he total that
Madison stood to gain from completion of both phases of the
Anson project was approximately $300,000 annually. . . . 
Therefore, the sooner Abington could complete the . . . first
phase the sooner Madison could realize their gains." Thus,
Madison gained from Abington's extra efforts to timely complete
the project. 

 Madison does not make a specific argument with regard to the
second quantum meruit element. Regarding the third component,
Madison argues that Abington could not have had a reasonable
expectation of payment. The Maine court has held that an
expectation of compensation is reasonable if the "services were
rendered under circumstances consistent with contract
relations." Colvin v. Barrett, 118 A.2d 775, 779 (Me. 1955). 
In determining reasonableness, all the surrounding circumstances
should be considered. See Bourisk v. Amalfitano, 379 A.2d 149,
151 (Me. 1977).

 "All that the law of quantum meruit requires [a plaintiff]
to prove . . . is that he had a reasonable expectation that his
work was not gratuitous, and that [the defendant] by her words
or conduct justified this expectation." Paffhausen, 708 A.2d at
272; see also Colvin, 118 A.2d at 778 ("'It must appear that the
one who rendered [the services] expected compensation and that
the one who received the services so understood, or under the
circumstances ought to have understood, and by his words or
conduct or both justified the expectation.'" (quoting Cole v.
Clark, 27 A. 186, 187 (Me. 1893))). In Paffhausen, the court
found that when the deceased owner of the home to which
plaintiff made improvements wrote that she gave full consent
and support to the plaintiff to use the home as long as he
needed it, the evidence fell short of proving a contract but
justified quantum meruit recovery. See Paffhausen, 708 A.2d at
273.

 In this case, the district court found that, for several
reasons, Madison's statements created a reasonable expectation
that Abington would be paid for the cost overruns:

 First, Abington made Madison aware that it expected to
be paid for the overruns once it began work on the
site. Second, Madison never disputed that it owed
Abington money for the overruns during the project. 
In fact, Madison gave repeated assurances to Abington
that it treated its contractors fairly and that
Abington's claim would be reviewed after the project
was completed. Even when Madison first questioned the
cost submission by Abington, it only stated that the
costs may be somewhat high. Third, both Steve Small
and Christopher Bean [of Madison] testified at trial
that during construction they thought Abington was
entitled to payment for the cost overruns. All these
facts support Abington's contention that it was
reasonable for it to expect payment for the cost
overruns.

(Footnote omitted).

 Madison strenuously argues that Abington's expectation was
not reasonable because Abington itself caused the extra costs
and the contract assigned the relevant risks to Abington. Even
if Abington were encouraged to perform extra work, Madison
contends, it was not entitled to form a reasonable expectation
of payment for that additional work. Madison alleges that its
statements to Abington constituted nothing more than a
suggestion to "consider other options" or an agreement to
negotiate. 

 The district court's findings were not clearly erroneous. 
The evidence revealed that Madison's statements were much more
than agreements to entertain further discussion.(7) Moreover,
regardless of the obligations in the contract, Madison indicated
to Abington that it would take responsibility for the costs
flowing from the defects in the project manual specifications,
namely, the tail pond's sea level and bottom contours, as well
as from high water flows.

 With regard to the amount of the damages award, at trial
Madison pointed to particular errors in Abington's accounting of
its extra costs, although it has not renewed these contentions
on appeal. On appeal, Madison makes the purely legal arguments
that the amount of the award bears no relation to any value it
retained but instead compensates Abington for the extra costs
caused by its breach and, in the alternative, that the court
should have reduced the award to only that amount due for
overtime work.(8) Madison relies on what it characterizes as the
"near-universal principle" that restitution to a breaching party
is limited to the contract price, citing Restatement (Second) of
Contracts § 374 cmt. b (1981). This principle appears to be
more appropriately applied, however, to cases where a party does
not fully perform its duties under a contract but seeks quantum
meruit recovery for the work that was performed than to a case
like the present one where extra-contractual work was performed.

 The Maine court has explained that the appropriate measure
of damages under quantum meruit recovery is "the reasonable
value of the services." William Mushero, Inc. v. Hull, 667 A.2d
853, 855 (Me. 1995) (upholding the trial court's finding that
the "reasonable value of services" was the price agreed to in an
oral contract between the parties, citing Aladdin Elec. Assocs.,
645 A.2d at 1145); see also Paffhausen, 708 A.2d at 273
(explaining that a carpenter seeking quantum meruit recovery was
entitled to "the reasonable value of his labor and materials
that went into the improvements to the building"). Here, the
court utilized Abington's cost figures, in conjunction with a
mark-up for profit, as permitted in Belanger v. Haverlock, 537
A.2d 604, 606 (Me. 1988), to determine the reasonable value of
Abington's services. Further, the court did not err in refusing
to reduce the amount of the damages award by the amount owed for
costs accruing due to contours in the river bottom because, as
we have explained, the responsibility for those costs was the
subject of post-contractual discussions between the parties.

 In conclusion, we find that under Maine law as it presently
stands Abington was entitled to pursue recovery on the basis of
quantum meruit and that the evidence supported the district
court's conclusion that the elements of quantum meruit existed. 
The judgment of the district court is therefore affirmed. 

1. So far as we have been able to ascertain, there was no
Addendum II.
2. The court referred to plaintiff's claim interchangably as
unjust enrichment and quantum meruit. See Combustion Eng'g, 812
F. Supp. at 261, 262.
3. In affirming the district court judgment, we agreed with
the district court that even if Maine law allowed quasi-contractual recovery when a contract existed, such recovery
should not be allowed under the circumstances. See Combustion
Eng'g, 13 F.3d at 445.
4. The court relied on a fourth case, Bowden v. Grindle, 651
A.2d 347 (Me. 1994). Bowden is unhelpful because there the
court held that a claim labelled "quantum meruit" by the
plaintiffs was actually one for unjust enrichment and remanded
the case to the trial court for a determination of that claim. 
See id. at 351. 
5. "[R]ecovery in quantum meruit is said to be based upon the
'assent' of the parties and, being contractual in nature, it
sounds in law." H. Hugh McConnell, Distinguishing Quantum Meruit
and Unjust Enrichment in the Construction Setting, 71-MAR Fla.
B.J. 88, 88 (1997); see Judy Beckner Sloan, Quantum Meruit:
Residual Equity in Law, 42 DePaul L. Rev. 399, 401 (1992)
("Quantum meruit is a legal action based on equitable
restitution."). 
6. In affirming the district court's ruling on quantum meruit,
we accepted the district court's erroneous characterization of
Maine law as disallowing such a claim: "without evidence of
fraud, or other circumstances that render the contract
inoperative, [a plaintiff] is foreclosed from seeking additional
payment outside the contract terms." Hodgkins, 82 F.3d at 1232
(citing Top of the Track
, 654 A.2d at 1296; Prest, 104 A. at
524). In Hodgkins, however, the parties did not exhibit post-contractual behavior that altered their relationship nor did the
plaintiff perform any additional services for which he could
have formed a reasonable expectation of payment. Moreover, as
we have just explained, the district court misapprehended the
holdings of Top of the Track and Prest.
7. Madison relies on cases in which the Maine Supreme Judicial
Court found that various statements did not constitute offers,
but rather were merely "agreements to agree," citing Searles v.
Trustees of St. Joseph's College, 695 A.2d 1206 (Me. 1997); SC
Testing Technology v. Department of Environmental Protection,
688 A.2d 421 (Me. 1996); Ault v. Pakulski, 520 A.2d 703 (Me.
1987). All three, however, dealt with whether a contract had
been created or how to construe a contract. None considered
whether a party had created a reasonable expectation sufficient
to justify quantum meruit relief for the other party. Moreover,
in all three cases, the court characterized the statements at
issue as vague, indefinite, or incomplete, see Searles, 695 A.2d
at 1211 (statement was not definite enough to constitute an
offer); SC Testing, 688 A.2d at 425 (statement was "equivocal
prediction about the future"); Ault, 520 A.2d at 704 (language
of settlement contract too "vague and incomplete" to allow
judicial enforcement); such is not the case here.
8. Abington's only response is that Madison has waived this
contention by opting at trial to challenge Abington's damages on
the ground that they had not been proven to a reasonable
certainty. Although it is true that Madison focused its post-trial brief to the district court on the errors in Abington's
accounting of costs, Madison did reference its argument that
Abington was not entitled to the full measure of extra costs
associated with the project. It has, therefore, preserved its
objections on principle to the damages award that we address
here.