STATE OF MAINE                    BUSINESS AND CONSUMER COURT

Cumberland, ss                        Location: Portland
                                      Docket No.: BCD-CV-14-34 ✓

DAVID L. SAVELL,                    )
                                    )
                Plaintiff           )
                                    )
        v.                          )
                                    )
THOMAS  D.  HAYWARD,  KEN  G.       )
SIMONE,  MICHAEL  B.  BRUEHL,       )
MICHAEL  A.  DUDDY,  and  KELLY,    )
REMMEL & ZIMMERMAN,                 )

                        Defendants

## ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS MICHAEL DUDDY AND KELLY, REMMEL & ZIMMERMAN

This matter is before the court on Plaintiff David L. Savell's Motion for Summary Judgment in his favor on Count IX of his Third Amended Complaint. Count IX alleges that Defendants Michael A. Duddy and his law firm Kelly, Remmel & Zimmerman (collectively "Attorney Defendants") committed attorney malpractice and breached their duty owed to the Plaintiff.

Attorney Defendants have opposed Plaintiff's motion, and have also filed a cross motion for summary judgment as to all four counts pleaded against them in Plaintiff's Third Amended Complaint: Counts VI, VII, VIII, and IX. Defendants contend that the Plaintiff has failed to establish facts on these claims that would entitle him to judgment.

1

## Factual Background

This suit arises out of Plaintiff's relationship with two corporate entities. The first is Sunbury Primary Care, P.A. ("SPC"). SPC was a medical practice serving members of the public and is comprised of three doctor shareholders ("Doctor Members"). (Pl.'s Supp. S.M.F ¶¶ 2-3; Defs.' Opp. S.M.F. ¶¶ 2-3.) At all relevant times, Plaintiff served as the chief executive officer of SPC. (Pl.'s Supp. S.M.F. ¶ 5; Defs.' Opp. S.M.F. ¶ 5.) The second entity is Sunbury Medical Properties, LLC ("SMP"). The only business of SMP has been the ownership and management of real property in Bangor, Maine where the medical business was located. (Pl.'s Supp. S.M.F. ¶ 11; Defs.' Opp. S.M.F. ¶ 11.) At all relevant times Plaintiff served as manager of SMP. In 2008, the Members of SMP voted to sell the Plaintiff an equal ownership Economic Interest in SMP for $5,200. (Pl.'s Supp. S.M.F. ¶ 16; Defs.' Opp. S.M.F. ¶ 16.) The Economic Interest provided the Plaintiff with a one-fourth interest in SMP and made him a one-fourth guarantor on debts owed to KeyBank.[1] (Pl.'s Supp. S.M.F. ¶ 17; Defs.' Opp. S.M.F. ¶ 17.)

From early February to mid-August 2013, the two entities negotiated with Eastern Maine Medical Center ("EMMC") for the sale of SPC's assets and for the sale of the real estate owned by SMP.[2] (Pl.'s Supp. S.M.F. ¶ 20; Defs.' Opp. S.M.F. ¶ 20.) On or about August 12, 2013, the shareholders of SPC and the members of SMP reached a tentative agreement for the sales of both companies for $4.6 million. The allocation of the sale price was $1 million for the sale of SPC's assets and $3.6 million for the real estate owned by SMP. (Pl.'s Supp. S.M.F. ¶

---

[1] Initially, the Plaintiff purchased a one-sixth interest. However, two members subsequently resigned from SMP. (Pl.'s Supp. S.M.F. ¶ 19; Defs.' Opp. S.M.F. ¶ 19.)

[2] The only significant asset owned by SMP was its real estate located at 133 Corporate Drive in Bangor. (Pl.'s Supp. S.M.F. ¶ 21; Defs.' Opp. S.M.F. ¶ 21.)

2

22; Defs.' Opp. S.M.F. ¶ 22.) On August 14, 2013, SPC and SMP sent a letter of acceptance of the tentative agreement. (Pl.'s Supp. S.M.F. ¶ 23; Defs.' Opp. S.M.F. ¶ 23.)

Going forward, SPC and SMP were represented by Defendant Duddy and his law firm Kelly, Remmel & Zimmerman. EMMC was represented by counsel from Eaton Peabody.[3] (Pl.'s S.M.F. ¶ 25.)

By mid-August, 2013, Plaintiff served as attorney Duddy's primary contact person for attorney Duddy's communications with SPC and SMP concerning the sales to EMMC. (Pl.'s Supp. S.M.F. ¶ 27; Defs.' Opp. S.M.F. ¶ 27.) On or about September 13, 2013, the Asset Purchase Agreement was signed by the parties. (Pl.'s Supp. S.M.F. ¶ 31; Defs.' Opp. S.M.F. ¶ 31.) Defendant Bruehl signed the Agreement on behalf of SPC in his capacity as Chair of SPC and Plaintiff signed in his capacity as Manager of SMP. The Doctor Members signed in their individual capacities as "physician owners." (Pl.'s Supp. S.M.F. ¶ 32; Defs.' Opp. S.M.F. ¶ 32.)

On September 27, 2013, Eaton Peabody informed Duddy that EMMC had determined that there were too many risks to proceed with the transaction as it was. As a result, the Agreement was amended. EMMC agreed to purchase the property for $3.95 million and sought to bifurcate the asset sale. Further, the sale price of SPC's assets was subject to reduction in the asset purchase price prior to closing and the net proceeds of SMP's real estate sale were to be held in escrow by Eaton Peabody to be used to satisfy any debts and liabilities associated with the asset closing. (Pl.'s Supp. S.M.F. ¶ 38; Defs.' Opp. S.M.F. ¶ 38.)

After closing on the sale of real estate by SMP on October 1, 2013, Eaton Peabody paid additional amounts from the escrow account to cover SPC pensions and payroll. (Pl.'s Supp. S.M.F ¶ 48; Defs.' Opp. S.M.F. ¶ 48.) After said payments, the balance remaining in the

---

[3] Defendants contend that while Attorney Duddy negotiated with EMMC with respect to the deal, the Plaintiff worked closely with operational personnel at EMMC regarding the transition of business. (Defs.' Opp. S.M.F. ¶ 25.)

3

escrow account as of October 24, 2013, was $387,530.20. (Pl.'s Supp. S.M.F. ¶ 49; Defs.' Opp. S.M.F. ¶ 249)

On October 9, 2013, Plaintiff sent an email to Attorney Duddy and noted that he wanted his money, the sum of $187,402 paid directly to him, leaving only $216,154 to cover SPC debts. (Pl.'s Supp. S.M.F. ¶ 50; Defs.' Opp. S.M.F. ¶ 50.) Plaintiff continued to repeatedly email Duddy concerning his share of the escrowed proceeds.[4] (Pl.'s Supp. S.M.F. ¶ 51; Defs.' Opp. S.M.F. ¶ 51.) For example, on October 14, 2013, Plaintiff contacted Duddy and requested his money before the end of business on Friday October 18, 2013. (Pl.'s Supp. S.M.F. ¶ 52; Defs.' Opp. S.M.F. ¶ 52.) Attorney Duddy responded to Plaintiff on October 14, 2013, indicating that he was out of the office, but would call the Plaintiff the next day. (Pl.'s Supp. S.M.F ¶ 53; Defs.' Opp. S.M.F. ¶ 53.) On the same day at 4:23 p.m., Duddy sent the doctors copies of one or more of Plaintiff's emails in which Plaintiff had requested the payment of his money. The email stated: "Gentlemen, please see the below email exchange with David. I need to talk with you about the arrangements you have made with David, and how you want to handle his expectation." (Pl.'s Supp. S.M.F ¶ 54; Defs.' Opp. S.M.F. ¶ 54.)

On October 21 and 22, 2013, Eaton Peabody told Duddy that EMMC would not close on the sale of assets by SPC unless the purchase was reduced to an amount sufficient only to pay SPC's then current liabilities, estimated to be about $400,000. EMMC indicated that if an

---

[4] An October 11, 2013 email from Plaintiff to Duddy reads:

> Additionally, I would like to have my share of the net proceeds received and placed in escrow after the medical Properties LLC closing. I am not sure what authority EMMC has to remain monies due an equal owner who is not part of [SPC] and definitely has not signed any personal guarantees for any outstanding [SPC] debt.
>
> Thank you for you anticipated cooperation.

(Pl.'s Supp. S.M.F. ¶ 51; Defs.' Opp. S.M.F. ¶ 51.)

4

appraisal revealed that the assets had a value less than $400,000 it would not purchase SPC assets.

Thereafter, on October 24, 2013, Plaintiff signed an authorization on behalf of SMP allowing Eaton Peabody to apply $372,774.16 of its funds held in escrow to satisfy amounts due or owed by SPC at the asset closing.[5] Said authorization was emailed to Attorney Duddy for review less than two hours before the closing. (Pl.'s Supp. S.M.F ¶ 62; Defs.' Opp. S.M.F. ¶ 62.) Plaintiff also signed the Second Amendment to the Asset purchase Agreement. Eaton Peabody sent the final draft of the Second Amendment to Duddy during the closing. (Pl.'s Supp. S.M.F. ¶ 63; Defs.' Opp. S.M.F. ¶ 63.)

At the time of closing on the sale of assets by SPC on October 24, 2013, SPC owed $759,223.56, including interest and legal fees, to Katahdin Trust Company on a promissory note and Line of Credit. (Pl.'s Supp. S.M.F. ¶ 68; Defs.' Opp. S.M.F. ¶ 68.) The Doctor Members were personal guarantors of both. (Pl.'s Supp. S.M.F. ¶ 69; Defs.' Opp. S.M.F. ¶ 69.) The funds available from the sale of assets were not sufficient to pay the debts owed to Katahdin Trust Company, and the escrowed SMP sales proceeds were applied to satisfy that debt. (Pl.'s Supp. S.M.F. ¶ 70; Defs.' Opp. S.M.F. ¶ 70.) As a result, Plaintiff has received no distribution or other financial benefit from the sale of real estate by SMP, except that his liability as a one-fourth co-guarantor, with the Doctor Members, on SMP's debt to KeyBank has been extinguished. (Pl.'s Supp. S.M.F. ¶ 75.)

Throughout November of 2013, Plaintiff contacted Duddy on a series of occasions. On November 4, 2013, Plaintiff sent Duddy an email listing various necessary accounting entries to be made in the companies' books, among the entries to be made was an unspecified amount owed to Plaintiff by SMP. (Pl.'s Supp. S.M.F. ¶ 80; Defs.' Opp. S.M.F. ¶ 80.) After an email

---

[5] The Plaintiff contends that he signed this document under the advice and guidance of Attorney Duddy. The Attorney Defendants deny this claim.

exchange concerning business accounting, Attorney Duddy responded to the Plaintiff: "Yes, let's continue with the close out stuff, and we'll ultimately get to your situation." (Pl.'s Supp. S.M.F ¶ 81; Defs.' Opp. S.M.F. ¶ 81.)

Plaintiff contends that the Attorney Defendants were representing his interests, and had a fiduciary duty to address the Plaintiff's claims and to inform the Plaintiff of the LLC's actions adverse to the Plaintiff's interests. The Attorney Defendants contend that no attorney-client relationship was established between the Plaintiff and the Defendants, and therefore that they owed the Plaintiff no duty for purposes of the professional malpractice claim in Count IX of the Third Amended Complaint. They also contend that they made no misrepresentations or committed tortious interference for purposes of Counts VI, VII and VIII of the Third Amended Complaint.

### Standard Of Review

M.R. Civ. P. 56(c) instructs that summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . show that there is no genuine issue as to any material fact set forth in those statements and that any party is entitled to a judgment as a matter of law." To survive a motion for summary judgment, the opposing party must produce evidence that, if produced at trial, would be sufficient to resist a motion for a judgment as a matter of law. *Rodrigue v. Rodrigue*, 1997 ME 99, ¶ 8, 694 A.2d 924. For purposes of summary judgment, "[a] material fact is one that can affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573 (citing *Kenny v. Dep't of Human Services*, 1999 ME 158, ¶ 3, 740 A.2d 560); *see also McIlroy v. Gibson's Apple Orchard*, 2012 ME 59, ¶ 7, 43 A.3d 948. A genuine issue exists when sufficient evidence supports a factual contest to require a fact-finder to choose between competing versions of the

6

truth at trial. *See Prescott v. Tax Assessor*, 1998 ME 250, ¶ 5, 721 A.2d 169 (citing *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)).

A party wishing to avoid summary judgment must present a *prima facie* case for each element of a claim or defense that is asserted. *See Reliance Nat'l Indem. v. Knowles Indus. Services*, 2005 ME 29, ¶ 9, 816 A.2d 63. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18. When the court rules on a motion for summary judgment, "'[it] is to consider *only* the portions of the record referred to, and the material facts set forth, in the Rule 7(d) statements.'" *Handy Boat Serv., Inc. v. Prof'l Services, Inc.*, 1998 ME 134, ¶ 16, 711 A.2d 1306 (quoting *Gerrity Co. v. Lake Arrowhead Corp.*, 609 A.2d 293 (Me. 1992)). The court will view the evidence in light most favorable to the non-moving party. *See, e.g., Steeves v. Bernstein, Shur, Sawyer & Nelson, P.A.*, 1998 ME 210, ¶ 11, 718 A.2d 186.

## Discussion

The four counts pleaded against the Attorney Defendants are Count VI, Tortious Interference with Contractual Relations; Count VII, Intentional Misrepresentation; Count VIII, Negligent Misrepresentation, and Count IX—Attorney Malpractice/Breach of Fiduciary Duty. This analysis addresses the last count first, and then the previous three, but first, a preliminary issue is addressed.

*Issue of Ripeness and Existence of Loss*

In another order issued this day regarding the pending motions involving the Doctor Defendants, the court noted that the Plaintiff has not shown that he has a present right to obtain any distribution from the LLC. That point may be dispositive of his claims against the Doctor Defendants, but does not affect his claims against the Attorney Defendants. In fact,

7

Plaintiff would say that, if he has no recourse against the Doctor Defendants, that only strengthens his claim against the Attorney Defendants for failing to protect his interests in a manner that would have given him meaningful recourse.

*Count IX—Attorney Malpractice/Breach of Fiduciary Duty*

Legal malpractice is the breach of the duty owed to a client by his or her attorney. *See Butler v. Mooers*, 2001 ME 56, 771 A.2d 1034; *Johnson v. Carleton*, 2001 ME 12, 765 A.2d 571. In legal malpractice cases, the plaintiff must show: "(1) a breach by the defendant attorney of the duty owed to the plaintiff to conform to a certain standard of conduct; and (2) that the breach of the duty proximately caused an injury or loss to the plaintiff." *Niehoff v. Shankman & Associates Legal Ctr., P.A.*, 2000 ME 214, ¶ 7, 763 A.2d 121, 124 (citing *Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 10, 742 A.2d 933).

Whether a duty exists is an issue of law to be determined by the court. *Fish v. Paul*, 574 A.2d 1365 (Me. 1990). Proximate cause exists in legal malpractice cases where "evidence and inferences that may reasonably be drawn from the evidence indicate that the negligence played a substantial part in bringing about or actually causing the injury or damage and that the injury or damage was either a direct result or a reasonably foreseeable consequence of the negligence." *Niehoff*, 2000 ME 214, ¶ 8, 763 A.2d 121 (citing *Merriam v. Wanger*, 2000 ME 159, ¶ 8, 757 A.2d 778). "The mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to judgment." *Merriam*, 2000 ME 159, ¶ 8, 757 A.2d 781.

The Attorney Defendants make a threshold argument about standing. They contend that the Plaintiff, as an economic interest holder in SMP, lacks legal capacity to bring the claims asserted. In support, Defendants cite the recent Law Court decision *Beaudry v. Harding*

8

for the proposition that: a member of an LLC has no basis to assert an individual claim against the LLC's attorney when the only harm alleged is not a harm personal to that member. 2014 ME 126, ¶ 5, 104 A.3d 134. In *Beaudry*, a member of an LLC brought an individual action against the LLC's attorney alleging that he negligently failed to maximize an insurance recovery on behalf of the LLC and caused the plaintiff to lose significant value in his distributive share. The Law Court affirmed that the plaintiff lacked the legal capacity to bring the claim, as he suffered no personal harm. Id. ¶ 5. In determining whether a personal harm is suffered, courts look to who suffered the harm and who would benefit from recovery. *See, e.g., Kroupa v. Garbus*, 583 F. Supp. 2d 949, 952 (N.D. Ill. 2008). In *Beaudry*, the court determined that any recovery from the attorneys would flow to the LLC and not to the plaintiff individually. Thus, there was no personal harm. 2014 ME 126, ¶ 5, 104 A.3d 134.

However, *Beaudry* is distinguishable from this case. First, as a mere economic interest holder, the Plaintiff does not have the same avenues for relief as a member of an LLC. Second, the plaintiff in *Beaudry* challenged the attorneys' representation of the LLC. In this case, the Plaintiff's claims against the Attorney Defendants are not based on their representation of the LLC; they are based on his contention that the Attorney Defendants represented him personally and thus owe him a duty to protect and enforce his right to the receipt of a quarter-share of the SMP sale proceeds. If successful in his claims, it is the Plaintiff who would recover and not the LLC. Because the Plaintiff has alleged a personal harm, the court finds that he has standing to challenge the validity of the Defendants' alleged legal representation.

Thus, the analysis shifts to whether Plaintiff is entitled to summary judgment in his fabor on Count IX, and if not, whether he at least has made a *prima facie* showing sufficient to defeat the Attorney Defendants' motion for summary judgment on that count.

The first issue relates to whether the Attorney Defendants owed any duty to Plaintiff. In the negligence context generally, whether a duty of care exists is an issue of law to be determined by the court. *Fish v. Paul*, 574 A.2d 1365 (Me. 1990). The primary issue here is whether there was an attorney-client relationship between the Plaintiff and the Attorney Defendants.

In Maine, practicing attorneys owe their respective clients a duty to exercise the degree of skill, care, and diligence exercised by members of the legal profession. *Fisherman's Wharf Associates II v. Verrill & Dana*, 645 A.2d 1133, 1136 (Me. 1994). "The term 'client' includes one who is either rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him." M. R. Evid. 502 (a)(1). Courts have been reluctant to extend an attorney's duty of care to persons other than his or her client.[6] *Graves v. Webber*, No. RE-06-107, 2007 WL 1523505 (Me. Super. Feb. 5, 2007).

An attorney-client relationship is created when "(1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance" (the *"Mangan test"*). *Board of Bar Overseers v. Mangan*, 2001 ME 7, ¶ 9, 763 A.2d 1189 (adopting the New Hampshire definition of an attorney-client relationship). The Law Court has held that "[a]n attorney-client relationship does not require the payment of a fee or formal retainer but may be implied from the conduct of the parties." *Dineen*, 500 A.2d at 264-265 (quoting *Matter of McGlothlen*, 99 Wash.2d 515, 663 P.2d 1330 (1983)). The determination of whether such relationship exists is a factual determination. *Mangan*, 2001 ME 7, ¶ 7, 763 A.2d 1189 (citing *Dineen*, 500 A.2d at 264 (Me. 1985)).

---

[6] The policy behind the court's reluctance to expand the duty of care is to avoid potential conflicts of interest that may arise if an attorney owed a duty to persons not identified as clients.

10

In this case, there was no contractual fee agreement or engagement letter between the Attorney Defendants and the subject entities. Attorney Defendants contend that they represented only the corporate entities and were in communication with the Plaintiff and the Doctor Members only so far as to provide meaningful representation to the entities.

The Plaintiff contends that the Attorney Defendants induced him to seek opinions, instructions, and legal advice from them and as a result he signed documents allowing his share of proceeds to pay the debts of SPC and its shareholders. Plaintiff further contends that the Attorney Defendants failed to advise him to seek independent counsel with respect to the sale, the allocations of proceeds from the sale, or for the protections of Plaintiff's rights to a proportionate share of the net proceeds from the sale. Because the determination of whether an attorney-client relationship exists is a factual determination, the court analyses the record evidence below.

Plaintiff alleges that he sought legal advice and assistance from Attorney Duddy regarding his claim to distribution proceeds on multiple occasions and Attorney Duddy repeatedly told the Plaintiff that he would "deal" with Plaintiff's claims. Plaintiff contends that he relied on Mr. Duddy's statements and believed that his interests were being represented.

In support of this claim, the Plaintiff directs the court to a series of emails exchanged between the Plaintiff and the Attorney Defendants. On October 9, 2013, Plaintiff contacted Duddy and indicated, "I want my $187,402 paid directly to me, leaving only, $216,154 to pay [SPC] debts." (Pl.'s Supp. S.M.F. ¶ 50; Defs.' Opp. S.M.F. ¶ 50.) Plaintiff continued to email Attorney Duddy making personal requests and recommendations. For example, on October 11, 2013, Plaintiff indicated that he would like to have his share of the net proceeds placed in escrow after the SMP closing. (Pl.'s Supp. S.M.F. ¶ 51; Defs.' Opp. S.M.F. ¶ 51.) On October 14, 2013, he requested that Attorney Duddy make EMMC's legal counsel aware of the sum

11

owed to Plaintiff as a private investor. (Pl.'s Supp. S.M.F. ¶ 52; Defs.' Opp. S.M.F. ¶ 52.) On October 23, 2013, one day before closing, Attorney Duddy informed the Plaintiff that the sale price had been reduced. Upon the Plaintiff reminding Duddy that he believed he was owed roughly $200,000, Attorney Duddy responded "we'll deal with your issue later." (Pl.'s Supp. S.M.F. ¶ 59.) Attorney Duddy on another occasion said to Plaintiff "we'll ultimately get to your situation." (Pl.'s Supp. S.M.F. ¶ 81; Defs.' Opp. S.M.F. ¶ 81.)

In the above referenced emails the Plaintiff made multiple personal requests concerning money he believed was owed to him. However, the only action requested of Attorney Duddy was to bring the Plaintiff's claim to the Doctor Members. The court finds that this evidence is not enough to demonstrate that the Plaintiff sought legal advice or assistance. Mere requests and demands to relay information do not satisfy the first prong of the *Mangan* test. Such requests and inquiries are so common in the course of real estate transactions and litigation that expanding this prong would potentially leave counsel for corporate entities "in the untenable position of being subject to ill-defined professional responsibilities and create the reality of conflicting loyalties." *Estate of Keatinge v. Biddle*, 2002 ME 21, ¶ 15, 789 A.2d 1271.

In response to the Plaintiff's requests, Attorney Duddy forwarded the Plaintiff's emails to the Doctor Defendants to make them aware of the Plaintiff's concerns. In return, the Doctor Members asked for Attorney Duddy's advice as to the best course of action. Plaintiff contends that Attorney Duddy provided legal assistance by relaying his messages to the Members and complying with the Plaintiff's request. Plaintiff further contends, that at the very least, Attorney Duddy impliedly agreed to provide assistance by telling Plaintiff, on multiple occasions, that he would deal with his claims. The court disagrees. As counsel for the LLC, Attorney Duddy had an obligation to inform the Doctor Defendants of all outstanding claims so they could proceed in the best course of action for the LLC. "An attorney for a corporation

12

does not simply by virtue of that capacity become the attorney for . . . its officers, directors or shareholders." *Sheinkopf v. Stone*, 927 F.2d 1259, 1264 (1st Cir. 1991) (quoting 1 R.E. Mallen & J.M. Smith, Legal Malpractice § 7.6 (3d ed. 1989)). Moreover, the e-mail correspondence between Plaintiff and attorney Duddy does not indicate that Plaintiff thought Duddy was acting as his attorney—Plaintiff was not asking Duddy for advice; instead, Plaintiff was telling Duddy what he wanted from the LLC and the Doctor Defendants. For his part, Duddy was telling Plaintiff his concerns would be dealt with later—not something an attorney would tell his own client. If Plaintiff had truly believed that Duddy was his attorney, it is hard to believe Plaintiff would have allowed his own attorney to defer dealing with his concerns until later.

On the other hand, in light of the Plaintiff's requests for assistance, it would have been preferable had for attorney Duddy to have made it clear to the Plaintiff that the Attorney Defendants were not representing him and that he should seek his own counsel.[7] This was especially called for when Attorney Duddy learned that the Plaintiff might lose the distribution Plaintiff had repeatedly asked attorney Duddy to confirm would be paid.[8] However, even if this

---

[7] Pursuant to Rule 1.13 of the Maine Rules of Professional Conduct which governs the "[o]rganization as [a] [c]lient":

  (a) A Lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.
  . . .
  (e) In dealing with the organization's directors, officers, employees, members, shareholders or *other constituents*, a lawyer shall explain the identity of the client as the organization when the lawyer knows or reasonably should know that the organization's interests may be adverse to those of the constituents with whom the lawyer is dealing.

[8] Comment 10 to Rule 1.13 of the Maine Rules of Professional Conduct states:

  There are times when the organization's interest may be or become adverse to those of one or more of its constituents. In such circumstances the lawyer should advise any constituent, whose interest the lawyer finds adverse to that of the organization of the conflict or potential conflict-of-interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation. Care must be taken to assure that the individual understands that, when there is such adversity of interest, the lawyer for the organization cannot provide

13

was ethically called for, "[v]iolation of a[n] [ethical] rule [does] not itself give rise to a cause of action against a lawyer nor [does] it create any presumption in such a case that a legal duty has been breached." M. R. Prof. Conduct Preamble (20).

Further, this is not the type of situation where a viable claim might lie that the attorney should be held liable for the foreseeable reliance of a non-client. In Maine, the "general rule is that an attorney owes a duty of care only to his or her client." *Estate of Cabatit v. Canders*, 2014 ME 133, ¶ 21, __ A.3d__. While there are very narrow exceptions to this rule,[9] the Law Court has indicated that "[a]n attorney will never owe a duty of care to a non-client . . . if that duty would conflict with the attorney's obligations to his or her clients." *Id.* In this case, extending the attorney-client relationship and subsequently a duty of care to the Plaintiff would create a conflict of interest, given that the Plaintiff's goal of obtaining payment from the SMP sale proceeds was adverse to SMP as well as the Doctor Defendants.

Finally, the court finds that the Plaintiff is not entitled to relief under a theory that the Defendants breached a fiduciary duty to the Plaintiff, because no attorney-client relationship existed between the parties and the court sees no other basis for deemed the Attorney Defendants to have any fiduciary obligations to the Plaintiff. Therefore, the court grants the Defendants' Motion for Summary Judgment as to Count IX.

---

legal representation for that constituent individual, and that discussions between the lawyer for the organization and the individual may not be privileged.

[9] In *Gagnon v. Dodwell*, then Superior Court justice Hjelm found a duty to exist where an attorney for an estate failed to effect the intent of the grantor in a deed and other testamentary documents. The plaintiff brought action against the attorney. Justice Hjelm distinguished *Nevin* because the transaction at issue in *Dodwell* was an inter-vivos conveyance. The plaintiff's claim against the attorney was not a claim to be asserted against the estate. While the plaintiff was not the attorney's client, the court determined that the attorney owed a duty to the plaintiff as the attorney knew the intent of the grantor and no conflict of interest arose as a result of the imposition of the duty. No. CV-04-245, 2006 WL 381882, at *2 (Me. Super. Feb. 1, 2006).

*Counts VI, VII and VIII—Tortious Interference, Fraud/Intentional Misrepresentation, Negligent Misrepresentation*

In addition to attorney malpractice, the Plaintiff brings three tort claims against the Attorney Defendants. For the reasons discussed below, the court grants the Defendants' Motion for Summary Judgment as to each claim.

In Count VI of Plaintiffs Third Amended Complaint, he contends that the Attorney Defendants, in concert with the Doctor Defendants, tortiously interfered with the Plaintiff's contractual relationship with SMP through fraudulent conduct. Said fraudulent conduct is alleged to have occurred when the Attorney Defendants failed to act after repeatedly indicating to the Plaintiff that his claim would be addressed. As a result of the alleged interference, Plaintiff sustained a loss equivalent to his one-fourth share of the net proceeds from the sale of real estate by SMP.

In Maine, to establish a claim for tortious interference with contractual relations, a plaintiff must prove the following: "(1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract or advantage through fraud[10] or intimidation; and (3) that such interference proximately caused damages."[11] *Currie v. Indus. Sec.,*

---

[10] Fraud requires the following:

(1) Making a false representation;
(2) Of a material fact;
(3) With knowledge of its falsity or in reckless disregard of whether it is true or false;
(4) For the purpose of inducing another to act or refrain from acting in reliance on it; and
(5) The other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff.

*Rutland v. Mullen,* 2002 ME 98, ¶ 14, 798 A.2d 1104. "Each of those elements must be proved by clear and convincing evidence." *Mariello v. Giguere,* 667 A.2d 588, 590 (Me. 1995).
[11] "Intimidation is not restricted to frightening a person for coercive purposes, but rather exists wherever a defendant has procured a breach of contract by making it clear to the party with which the

15

*Inc.*, 2007 ME 12, ¶ 31, 915 A.2d 400 (*quoting Rutland v. Mullen*, 2002 ME 98, ¶ 13, 798 A.2d. 1104).

To make a showing of fraud, the Plaintiff must provide evidence that Attorney Duddy intentionally misled the Plaintiff with the purpose of inducing him to act or refrain from acting. In this case, Attorney Duddy told Plaintiff on multiple occasions that he would deal with his claims. In fact, Attorney Duddy did present information concerning the Plaintiff's claims to the Members of SMP. However, the Plaintiff has failed to demonstrate on this record that the Attorney Defendants made any intentional misrepresentation to Plaintiff. Attorney Duddy never promised Plaintiff his claim would be honored, or said anything other than words to the effect that Plaintiff's request would have to be deferred to, and dealt with, later. Because fraud is an essential element of a claim for intentional interference with contract, the court grants the Attorney Defendants' Cross-Motion for Summary Judgment as to Count IV.

In Count VII of his Third Amended Complaint, Plaintiff alleges that Attorney Defendants committed fraud by intentionally failing to inform the Plaintiff that he would not receive his one-fourth distribution of proceeds from the sale of real estate by SMP. Plaintiff further contends that he was induced by the Attorney Defendants into signing the authorization for the transfer of funds from the escrow account.

To prevail on a claim of fraudulent/intentional misrepresentation, the Plaintiff must show:

(1) that [the Defendants] made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing plaintiff to act in reliance upon it, and (5) plaintiff[s] justifiably relied upon the representation as true and acted upon it to [their] damage.

---

plaintiff had contracted that the only manner in which that party could avail itself of a particular benefit of working with defendant would be to breach its contract with plaintiff."
*Currie*, 2007 ME 12, ¶ 31, 915 A.2d 400 (quoting *Pombriant v. Blue Cross/Blue Shield of Maine*, 562 A.2d 656, 659 (Me. 1989)) (citations omitted).

16

*Mariello v. Giguere*, 667 A.2d 588, 590 (Me. 1995) (citing *Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me. 1992)).

In this case, Plaintiff has failed to demonstrate that the Attorney Defendants misrepresented any material fact or that the Plaintiff was fraudulently induced into signing any document. There is no evidence in the record indicating that the Attorney Defendants represented or supplied false information to the Plaintiff. Rather the evidence indicates that attorney Duddy simply told the Plaintiff that his concerns would be addressed later, presumably to get the EMMC transaction closed.

When Plaintiff signed the documents allowing SMP's sale proceeds to be applied to SPC's debt instead of being paid to SMP, he knew, first, that his request for payment, or at least assurance of payment, of his quarter-share was being deferred to a later date, and knew the import of what he was signing. "The law presumes, in the absence of fraud or imposition, that [the Plaintiff] read it, or was otherwise informed of its contents, and was willing to assent to its terms without reading it." *Hix v. E. S.S. Co.*, 107 Me. 357, 78 A. 379, 381 (1910); *see also Francis v. Stinson*, 2000 ME 173, ¶ 42, 760 A.2d 209, 217-18 ("As a matter of general contract law, parties to a contract are deemed to have read the contract and are bound by its terms."). In effect, by agreeing to sign without his demand for assurances having been met, he must be held to have knowingly assumed the risk that his demands would later be refused.

For similar reasons, the Attorney Defendants are entitled to summary judgment on Count VIII—Negligent Misrepresentation._In Maine a party will be held liable for negligent misrepresentation "if in the course of his business he supplies false information for the guidance of others in their business transactions, and the other party justifiably relies upon it to his pecuniary detriment." *Guiggey v. Bombardier*, 615 A.2d at 1173 (citing *Chapman v. Rideout*, 568 A.2d 829, 830 (Me.1990)); *see also Restatement (Second) of Torts § 552.* Whether a party made a

17

misrepresentation and whether the opposing party justifiably relied on a misrepresentation are questions of fact. *See McCarthy v. U.S.I. Corp.*, 678 A.2d 48, 53 (Me.1996); *Devine v. Roche Biomedical Labs., Inc.*, 637 A.2d 441, 446 (Me. 1994). "Additionally, liability only attaches if, when communicating the information, the party making the alleged misrepresentation "fails to exercise the care or competence of a reasonable person under like circumstances," an inquiry that is likewise for the fact-finder." *Rand v. Bath Iron Works*, 2003 ME 122, ¶ 13, 832 A.2d 771.

In this case, the record is devoid of evidence demonstrating that the Attorney Defendants supplied false information to guide the Plaintiff in a business transaction. It is quite true that silence can "rise[] to the level of supplying false information when such failure to disclose constitutes the breach of a statutory duty." *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 903 (Me. 1996). But here, for reasons previously indicated, the Attorney Defendants were under no such duty.

### Conclusion

Plaintiffs Motion For Summary Judgment on Count IX of the Third Amended Complaint is denied. Defendants' Cross-Motion for Summary Judgment on Counts VI, VII, VIII, and IX of the Third Amended Complaint is granted. Judgment is granted to Defendants Michael A. Duddy and Kelly, Remmel & Zimmerman.

Pursuant to M.R. Civ. P. 79, the clerk is hereby directed to incorporate this order into the docket by reference.

Dated February 27, 2015

A. M. Horton, Justice
Business & Consumer Court

18

**David L. Savell v. Thomas D. Hayward, Kenneth G. Simone, Michael B. Bruehl, Michael A. Duddy and Kelly, Remmel & Zimmerman**
**BCD-CV-14-34**


**David L. Savell**
    **Petitioner / Plaintiff**

    Counsel:                      Barry Mills, Esq.
                                    Hale & Hamiln
                                    PO Box 729
                                    Ellsworth, ME 04605


**Thomas D. Hayward, Kenneth G. Simone**
    **Respondents / Defendants**

    Counsel:                      James Haddow, Esq.
                                    50 Monument Square
                                    PO Box 17555
                                    Portland, ME 04112-8555


**Michael A. Duddy and Kelly, Remmel & Zimmerman**
    **Respondents / Defendants**
    Counsel:                      James Bowie, Esq.
                                    Three Canal Plaza
                                    PO Box 4630
                                    Portland, ME 04112-4630

STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-CV-14-34 ✓

DAVID L. SAVELL,

Plaintiff

v.

THOMAS D. HAYWARD, KEN G. SIMONE, MICHAEL B. BRUEHL, MICHAEL A. DUDDY, and KELLY, REMMEL & ZIMMERMAN,

Defendants

## ORDER ON PENDING MOTIONS
## BETWEEN PLAINTIFF AND THE DOCTOR DEFENDANTS

This action is before the court on Plaintiff David Savell's Motion for Summary Judgment against Defendants Thomas Hayward, Ken Simone and Michael Bruehl [collectively "the Doctor Defendants"] on Counts I through V of his Third Amended Complaint. The Doctor Defendants oppose Plaintiff's Motion and ask that summary judgment be rendered against Plaintiff on those counts, and have filed a cross motion for summary judgment on the remaining counts pleaded against them—Counts VI-VIII.

Plaintiff's Motion contends that the Doctor Defendants owe him the sum of $190,454, which is equal to one-fourth of the net proceeds from the sale of certain commercial property located in Bangor, Maine.

In response, Defendants contend that the Plaintiff is not—or, at least, not yet—entitled to his one-fourth interest. Further, they contend that Plaintiff's claim, if any, runs only against the limited liability company that sold the commercial property in question, and that they have no personal liability to Plaintiff.

1

## Factual Background

Sunbury Primary Care, P.A. ("SPC") is or was a professional services corporation engaging in the practice of medicine, with its principal place of business in Bangor, Maine. (Pl.'s Supp. S.M.F. ¶ 1; Defs.' Opp. S.M.F. ¶ 1.) At all times relevant to the case, SPC was in the business of furnishing medical services to members of the public. (Pl.'s Supp. S.M.F. ¶ 2; Defs.' Opp. S.M.F. ¶ 2.) At all relevant times, the Doctor Defendants—Hayward, Simone, and Bruehl—were the only shareholders of SPC. (Pl.'s Supp. S.M.F. ¶ 4; Defs.' Opp. S.M.F. ¶ 4.) At all relevant times, Plaintiff David Savell was employed as the Chief Executive Officer of SPC. Under his employment contract, Plaintiff was "directly and solely responsible" to SPC's board of directors. (Pl.'s Supp. S.M.F. ¶ 6; Defs.' Opp. S.M.F. ¶ 6.)

Sunbury Medical Properties, LLC ("SMP") is a limited liability company (LLC) that had its principal place of business in Bangor, Maine, and with the three Doctor Defendants as members. (Pl.'s Supp. S.M.F. ¶ 10; Defs.' Opp. S.M.F. ¶ 10.) SMP owned and managed the real property located at 133 Corporate Drive, Bangor, occupied by SPC's medical offices. Plaintiff also served as the manager of SMP, and in that role had responsibility and authority to manage the business and carry out all acts customary or incident to the management of the company. (Pl.'s Supp. S.M.F. ¶ 13; Defs.' Opp. S.M.F. ¶ 13.) I

In September 2008, Plaintiff purchased an equal ownership economic interest in SMP for $5,200,[1] thereby becoming a one-fourth economic interest holder in SMP and also a one-fourth guarantor on secured debt owed by SMP to KeyBank. (Pl.'s Supp. S.M.F. ¶ 19; Defs.' Opp. S.M.F. ¶ 19.)

In 2012, the SPC medical practice began to experience financial distress. SPC through the Plaintiff and the Doctor Defendants began negotiations with Eastern Maine Medical

---

[1] Plaintiff's rights and obligations as owner of an "economic interest" are specified in SMP's Operating Agreement.

2

Center ("EMMC") for the sale of SPC as a going concern and the sale of the real estate owned by SMP.[2] (Pl.'s Supp. S.M.F. ¶ 20; Defs.' Opp. S.M.F. ¶ 20.) In August of 2013, the parties reached a tentative agreement for the sale of both companies to EMMC for a combined price of $4.6 million.[3] SPC and SMP sent a letter of acceptance of the tentative agreement to EMMC dated August 14, 2013.[4] SPC and SMP were both represented by Michael Duddy of the Kelly, Remmel & Zimmerman law firm. EMMC was represented by counsel from the Eaton Peabody law firm.

On September 5, 2013, Eaton Peabody sent Attorney Duddy a draft of the Asset Purchase Agreement.[5] (Pl.'s Supp. S.M.F. ¶ 30; Defs.' Opp. S.M.F. ¶ 30.) The closing on the Asset Purchase Agreement was to be on or before September 30, 2013. However, prior to the closing, the parties executed an amendment to the Asset Purchase Agreement, which was signed on October 1, 2013.[6] (Pl.'s Supp. S.M.F. ¶ 34; Defs.' Opp. S.M.F. ¶ 34.) Said Amendment altered the terms of the Asset Purchase Agreement in the following ways. First, SPC, SMP, and the Physician Owners agreed to divide the closing into two parts, a closing on the sale of SMP's real estate to take place on September 30, 2013, and a sale of assets of SPC to take place on or before October 31, 2013. Second, the sale price of SPC's assets was subject to

---

[2] The only significant asset owned by SMP was its real estate at 133 Corporate Drive in Bangor. Initially, both EMMC and St. Joseph's Hospital were interested in buying the property. (Defs.' Addt'l S.M.F. ¶ 8; Pl.s' Rep. S.M.F. ¶ 8.) However, by February 2013 EMMC was the only interested buyer. (Defs.' Addt'l S.M.F. ¶ 9.)

[3] The sale price was subject to audit verification by EMMC.

[4] The letter as signed by Defendant Bruehl as Chair of the SPC Board and by Plaintiff as the Manager of SMP. (Pl.'s Supp. S.M.F. ¶ 23; Defs.' Opp. S.M.F. ¶ 23.)

[5] The Asset Purchase Agreement was signed by Defendant Bruehl in his capacity as Chair of SPC. Plaintiff signed in his capacity as Manager of SMP. The doctors signed the Agreement in their individual capacities as "Physician Owners."

[6] Again Defendant Bruehl signed the Amendment on behalf of SPC in his capacity as Chair. Plaintiff signed in his capacity of Manager of SMP and the Defendant Doctors signed in their individual capacities as Physician Owners.

reduction at the request of EMMC.[7] Finally, the net proceeds of SMP's real estate sale were to be held in escrow by Eaton Peabody.[8] (Pl.'s Supp. S.M.F. ¶ 36; Defs.' Opp. S.M.F. ¶ 36.)

On October 1, 2013, SMP closed on its sale of real estate to EMMC.[9] The sale price was $3.95 million. The net amount received by SMP from the sale was $794,006.69. The amount was held in escrow pursuant to Section 7.i of the First Amendment to the Asset Purchase Agreement. (Pl.'s Supp. S.M.F. ¶ 43). The sale of SPC assets was deferred until on or before Oct 31, and the remaining amount held in escrow after making various payments was $593,044.41. (Pl.'s Supp. S.M.F. ¶ 45; Defs.' Opp. S.M.F. ¶ 45.)

---

[7] Paragraph 6 of the Amended Agreement reads:

> Buyer and seller agree that the delays in the Asset Closing will result in additional costs to the parties that were not included in the Asset Purchase price. Buyer and Seller agree to negotiate in good faith regarding a reduction in the Asset Purchase Price prior to the Asset Closing. The reduction in the Asset Purchase Price must be satisfactory to Buyer, in its sole discretion, or Buyer shall not be obligated to proceed with the Asset Closing. This Section shall be treated as an additional condition precedent to Buyer's obligation to close the Asset Purchase under Section 8.02 of the Asset Purchase Agreement.

*See* Amended Agreement ¶ 6.

[8] Paragraph 7.1 of the Amended Agreement reads:

> After adjustments to the Real Estate purchase price at the Real Estate Closing, any proceeds due Sunbury Medical at the Real Estate Closing in excess of Fifty Thousand dollars ($50,000.00) shall be withheld and placed in an escrow account; Eaton Peabody shall be the Escrow Agent and shall hold the escrowed funds in accordance with the terms hereof and Exhibit A hereto. The escrowed funds shall be used to satisfy liabilities associated with the Asset Closing, including but not limited to adjustments contemplated under Section 2.05 of the Agreement, personal property taxes and liens in favor of Katahdin Trust Company. *Notwithstanding the foregoing limitation*, during the Interim Period, upon written request from Seller to Escrow Agent, Escrow Agent shall deliver to Seller up to Two Hundred Two Thousand dollars ($202,000.00), to be used to pay pension obligations of Seller. Acceptance of such funds by Seller shall be deemed and constitute Seller's agreement that such funds shall be used only for such purpose. In the event the Asset Closing does not occur, all funds remaining in escrow shall be immediately paid to Sunbury Medical, subject to any adjustments contemplated under Section 2.05 of the Agreement. [Italics in original.]

[9] By signing the Amendment both SPC and SMP understood and agreed: (1) that there would be two closings; one for the real estate and one for the practice; (2) that the approximately one month delay in the Practice closing would result in additional costs to the parties; (3) that at the sole discretion and satisfaction of EMMC as the buyer, the Practice would be subject to a reduction in the sale price as the result of those costs; and (4) that the net proceeds of the real estate sale were to be held in escrow by EMMC's attorney's and used to satisfy liabilities of the Practice.

4

The amount was reduced further after the payment of SPC pensions and payroll and a wire fee. The remaining amount as of October 24, 2013, was $387,530.20. (Pl.'s Supp. S.M.F. ¶ 48; Defs.' Opp. S.M.F. ¶ 148.) Plaintiff claims to be entitled to a one-fourth share of the proceeds of the sale of the real estate by SMP to EMMC upon the dissolution of the company.

While the parties agree that the Plaintiff never waived his interest in the proceeds, the Doctor Defendants contend that none of the prerequisites to a distribution of assets required under the Operating Agreement have been completed. Specifically, they contend that Plaintiff is not entitled to any distribution from the LLC unless and until the LLC is wound up and dissolved. They contend that it is unknown how much any member or economic interest holder is entitled to, if anything. (Defs.' Opp. S.M.F. ¶ 42.) They also assert that Plaintiff's recourse is against the LLC, and that they cannot be held individually liable for an obligation of the LLC without a determination that the corporate veil should be pierced.

Plaintiff contends that during a meeting of SPC shareholders held on September 10, 2013, prior to the signing of the initial Asset Purchase Agreement, Defendant Hayward told Plaintiff that the reallocation of the sale price of the SMP real estate would result in Plaintiff's one-fourth economic interest being valued at roughly $80,000 more than his original purchase price.[10] (Pl.'s Supp. S.M.F. ¶ 52; Defs.' Opp. S.M.F. ¶ 52.) Based on the overall transaction as it was understood to be as of that date, this was not an incorrect assessment. While Defendant Hayward requested that the Plaintiff reduce his share of the sale proceeds, Plaintiff did not agree to such reduction.

On October 13-14, Plaintiff made repeated attempts through attorney Michael Duddy, who was representing SPC and SMP in the transaction with EMMC, to clarify that he would receive a share of the SMP proceeds. Attorney Duddy relayed Plaintiff's concerns to the

_____

[10] Defendants Simone and Bruehl were also present at the meeting. (Pl.'s Supp. S.M.F. ¶ 52; Defs.' Opp. S.M.F. ¶ 52.)

5

Doctor Defendants, who, through attorney Duddy, told Plaintiff that his concerns would be addressed later, thus neither rejecting his demand for assurances nor agreeing to it.

By emails dated October 21 and 22, 2013, EMMC acted on its right to reduce the sale price of the assets and declared that it would agree to purchase the SPC practice for only as much as would be necessary, along with the escrowed proceeds from the sale of SMP's real estate, to cover SPC's liabilities. (Pl.'s Supp. S.M.F. ¶ 56; Defs.' Opp. S.M.F. ¶ 56.) SPC through Plaintiff and the Doctor Defendants acquiesced to this modification. At the closing on the sale of the Practice on October 24, 2013, Plaintiff signed a Second Amendment to the Asset Purchase Agreement on behalf of the LLC, in which the LLC authorized the release of nearly all of the remaining escrow funds to satisfy the liabilities of SPC. The assets were sold at the closing for only $400,000. (Pl.'s Supp. S.M.F. ¶ 66.)

As a result of the sale of both entities, Plaintiff was released from his personal obligation as a one-fourth guarantor of SMP's debt to Key, while the Doctors were released from their personal obligations as guarantors on both the Key debt and on certain debts owed by SPC. (Pl.'s Supp. S.M.F. ¶ 74; Defs.' Opp. S.M.F. ¶ 74.) To date, Plaintiff has received no proceeds from SMP reflecting his one-fourth interest.

Plaintiff Savell's nine-count Third Amended Complaint asserts the following counts against the Doctor Defendants:

- Count I, Unjust Enrichment

- Count II, Breach of Duty of Good Faith and Fair Dealing, 31 M.R.S. §1522.F; Common Law

- Count III, Breach of Contract

- Count IV, Quantum Meruit

- Count V, 26 M.R.S. §§626-626-A

6

- Count VI, Tortious Interference with Contractual Relations

- Count VII, Intentional Misrepresentation

- Count VIII, Negligent Misrepresentation

As noted above, Plaintiff has moved for summary judgment on Counts I through V, whereas the Doctor Defendants seek summary judgment on all counts against them.

## Standard Of Review

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . show that there is no genuine issue as to any material fact set forth in those statements and that any party is entitled to a judgment as a matter of law." M.R. Civ. P. 56(c). To survive a motion for summary judgment, the opposing party must produce evidence that, if produced at trial, would be sufficient to resist a motion for a judgment as a matter of law. *Rodrigue v. Rodrigue*, 1997 ME 99, ¶ 8, 694 A.2d 924.

For purposes of summary judgment, "[a] material fact is one that can affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573 (citing *Kenny v. Dep't of Human Services*, 1999 ME 158, ¶ 3, 740 A.2d 560); *see also McIlroy v. Gibson's Apple Orchard*, 2012 ME 59, ¶ 7, 43 A.3d 948. A genuine issue exists when sufficient evidence supports a factual contest to require a fact-finder to choose between competing versions of the truth at trial. *See Prescott v. Tax Assessor*, 1998 ME 250, ¶ 5, 721 A.2d 169 (citing *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)).

A party wishing to avoid summary judgment must present a prima facie case for each element of a claim or defense that is asserted. *See Reliance Nat'l Indem. v. Knowles Indus. Services*, 2005 ME 29, ¶ 9, 816 A.2d 63. "If material facts are disputed, the dispute must be resolved

7

through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18. When the court rules on a motion for summary judgment, "'[it] is to consider *only* the portions of the record referred to, and the material facts set forth, in the Rule 7(d) statements.'" *Handy Boat Serv., Inc. v. Prof'l Services, Inc.*, 1998 ME 134, ¶ 16, 711 A.2d 1306 (quoting *Gerrity Co. v. Lake Arrowhead Corp.*, 609 A.2d 293 (Me. 1992)). The court will view the evidence in light most favorable to the non-moving party. *See, e.g., Steeves v. Bernstein, Shur, Sawyer & Nelson, P.A.*, 1998 ME 210, ¶ 11, 718 A.2d 186.

## Discussion

1. <u>Plaintiff's Claim To a Distribution Under the SMP Operating Agreement</u>

A threshold contention of the Doctor Defendants is that no distribution from the SMP real estate sale is due to the Plaintiff. The Doctor Defendants contend that, because the escrowed sales proceeds were payable to the LLC, and because the LLC still exists and its affairs have not been wound up, Plaintiff's entitlement as a one-fourth economic interest holder has yet to be determined, and that this action was thus prematurely brought. The Plaintiff contends that the Doctor Defendants have refused to acknowledge his entitlement or to take any steps to wind down the LLC.

"[T]he paramount principle in the construction of contracts is to give effect to the intention of the parties as gathered from the language of the agreement viewed in light of all the circumstances under which it was made." *SC Testing Tech., Inc. v. Dep't of Envtl. Prot.*, 688 A.2d 421, 424 (Me. 1996) (*citing F.O. Bailey Co. v. Ledgewood, Inc.*, 603 A.2d 466, 468 (Me. 1992)). When the language of a contract is not ambiguous, the contract's interpretation is a question of law for the court. Id. "Contract language is ambiguous when it is reasonably susceptible of different interpretations." *American Policyholders Ins. Co. v. Kyes*, 483 A.2d 337, 340 (Me. 1984).

8

In this case, the Operating Agreement governs the distribution of proceeds. Nothing in the Operating Agreement requires the distribution of SMP assets to members or holders of an economic interest, unless the LLC is dissolved. Under the terms of the Operating Agreement SMP shall be dissolved upon the occurrence of any of "the sale or other disposition of all or substantially all of the assets of the Company or the permanent cessation of the Company's business operations.

Section 12.1(c) states that a statement of intent to dissolve must be filed with the Secretary of State as a prerequisite to dissolution. Following the filing of a statement of intent, the Article XII Section 12.3(a) of the Operating Agreement requires that the Manager wind up, liquidate, and distribute assets. The Section describes the process as follows:

(i)     sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managers may determine to distribute any assets to the Member in kind);

(ii)    discharge or make reasonable provision for all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are also creditors (other than liabilities to Members and Economic Interest Owners for distributions and the return of capital) and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members and Economic Interest Owners, the amounts of such Reserves shall be deemed to be an expense of the Company);

(iii)   distribute the remaining assets of the Company in the following order of priority:

1.  To each Member or Economic Interest Owner, with respect to the cumulative amount of all accrued but unpaid pre-dissolution distributions for which the Company is liable to such Member or Economic Interest Owner, the amount of such liability;

2.  To each Member and Economic Interest Owner, with respect to his unreturned capital contribution, an amount equal to the positive balance (if any) in his Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs), or, if the assets available to be distributed hereunder are insufficient to cover the aggregate of the Members' and Economic Interest Owners' positive balances, a proportionate amount based upon the relative positive balances of the Members and Economic Interest Owners; and

9

3. To each Member and Economic Interest Owner, with respect to his Membership Interest, as the case may be, a proportionate share of the remaining assets equal to his proportionate share of all Economic Interests.

Article XII Section 12.3(a).

To date, no such statement of intent has been filed with the Secretary of State. (Defs.' Addt'l S.M.F. ¶ 19; Pl.'s Rep. S.M.F. ¶ 19.) Further, the LLC remains registered and in good standing with the State of Maine. (Defs.' Addt'l S.M.F. ¶ 20; Pl.'s Rep. S.M.F. ¶ 20.) The affairs have not been wound up, and no accounting has occurred. (Defs.' Addt'l S.M.F. ¶ 21; Pl.'s Rep. S.M.F. ¶ 21.)

As noted, nothing compels the LLC to make the distribution to Plaintiff Savell that he claims to be due. None of the claims in his Third Amended Complaint seeks to compel winding up of the LLC, and he has not named the LLC as a party defendant on any theory of liability.

Instead, his Third Amended Complaint essentially ignores the existence of the LLC, and seeks to impose personal liability on the Doctor Defendants directly. Individual officers and employees of a corporation can be held personally liable for their own tortious acts, *see Advanced Const. Corp. v. Pilecki*, 2006 ME 84, ¶ 13, 901 A.2d 189; *see also Mariello v. Giguere*, 667 A.2d 588, 590-91 (Me. 1995), and subsequent portions of this Order analyze the issue of the Doctor Defendants' personal liability based on their own acts and omissions. Another basis on which the Doctor Defendants could be held liable is on a theory of piercing the corporate veil, also analyzed below. However, both theories for holding the Doctor Defendants individually liable require the Plaintiff to prove that he has suffered an economic loss for which he can recover damages.

The fact that the LLC is still in existence and has not been wound up or dissolved means that it remains speculative as to whether or not he has sustained any actual loss of an

10

entitlement based on his economic interest in SMP. Plaintiff could have sued the LLC and the Doctor Defendants together—i.e., it may be that he is not required to exhaust his remedy against the LLC before proceeding against the Doctor Defendants—but the fact that he has not pursued any remedy against the LLC means that the Doctor Defendants can contend—as they do contend—that he has not demonstrated any actual loss.

On the other hand, the reason why Plaintiff cannot prove that he has a present enforceable entitlement to a distribution is that the Doctor Defendants as members of SMP have not taken any steps either to make a distribution or to dissolve the LLC. They also apparently have not taken any steps to reimburse SMP for using sales proceeds from its real estate to satisfy SPC's debt and, in so doing, to extinguish their obligation as guarantors of that debt.

For these reasons, the court concludes that, although the Plaintiff may not be presently entitled to obtain a distribution from SMP under the Operating Agreement, whether he may have recourse against the Doctor Defendants is a different question. The analysis turns to the individual counts pleaded against the Doctor Defendants.

2. Personal Liability of Defendant Doctors For Damages Under Counts I-VIII

The Doctor Defendants can be held personally liable to the Plaintiff either based on the doctrine of piercing the corporate veil, or based on their own independently actionable acts or omissions, or both. These alternate grounds for imposing personal liability on the Doctor Defendants are examined in turn.

i. *Piercing the Corporate Veil*

Maine law recognizes corporations to be separate legal entities with limited liability. *Johnson v. Exclusive Properties Unlimited*, 1998 ME 244, ¶ 5, 720 A.2d 568. "As such, courts are generally reluctant to disregard the legal entity and will cautiously do so only when necessary

11

to promote justice." *Anderson v. Kennebec River Pulp & Paper Co.,* 433 A.2d 752, 756 n.5 (1981).[11] However, the Law Court has held that the corporate entity, which in this case is a limited liability company, can be disregarded (1) if the defendant dominated, abused or misused the corporate form, and (2) if the court's recognition of a separate corporate existence would cause an unjust or inequitable result. *See Johnson v. Exclusive Prop. Unlimited,* 1998 ME 244, ¶ 6, 720 A.2d 568, 571; *see also* 31 M. R. S. § 1544 (noting the limited liability of members and managers of LLCs).[12]

In determining whether a member, has abused the privilege of a separate corporate entity the courts will examine a series of factors. For example:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity[,] assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; [and] (12) use of the corporation in promoting fraud.

*Id.* ¶ 7.

In this case, the Plaintiff contends that SMP is now a defunct corporation with no assets. Even if true, those circumstances do not, in and of themselves, justify imposing personal liability for obligations of the LLC on the members of the LLC. The same holds true for purposes of SPC. To assert a claim against the Doctor Defendants personally, based on their status as members of SMP or officers, directors and shareholders of SPC (rather than based on

---

[11] *See also Bonnar-Vawter, Inc. v. Johnson,* 157 Me. 380, 387, 173 A.2d 141 (1961) noting: Maine courts will "disregard the legal entity of a corporation . . . with caution and only when necessary in the interest of justice."

[12] The statute states:

> A person who is a member of a limited liability company is not liable, under a judgment, decree or order of a court, or in any other manner, for a debt, obligation or liability of the limited liability company, whether arising in contract, tort or otherwise or for the acts or omissions of any other member, agent, or employee of the limited liability company.

31 M. R. S. § 1544.

12

their own independently actionable conduct), Plaintiff must establish the elements necessary for the court to pierce the corporate veil.

The Plaintiff contends that the Doctor Defendants wrongfully caused SMP to direct the proceeds held in the Eaton Peabody law firm's escrow account to be applied to debts owed by SPC for a line of credit with Katahdin Trust Company. The Doctor Defendants had personally guaranteed the Katahdin Trust debt. It is the Plaintiff's contention that SMP should have distributed the proceeds of the real estate sale to him and the three Doctor Defendants, and the Doctor Defendants should have paid SPC's debt from their *pro rata* share of the proceeds instead of using what would have been his quarter-share to pay their debts.

There is some justification for that argument—one reasonable view of what happened is that the Doctor Defendants engaged in self-dealing, in taking care of themselves first and ignoring the Plaintiff's concerns. However, the facts also show that the Doctor Defendants conducted the transaction in a manner consistent with the corporate form, not in a manner that showed disregard. The facts also show that the Plaintiff acquiesced and cooperated in the transaction about which he now complains. On the other hand, he can credibly contend that he cooperated in the assignment of SMP's sale proceeds to pay the SPC debt only because the Doctor Defendants, through their attorney, led him to believe that his claim would be dealt with later.

The First Amendment to the Asset Purchase Agreement indicated that EMMC would be entitled to reduce the asset sale price and that any proceeds due Sunbury Medical at the time of the real estate closing would be held in escrow by Eaton Peabody. The escrowed funds were to be used to satisfy liabilities associated with the asset closing, including but not limited to property taxes, and liens in favor of Katahdin Trust Company. The First Amendment was

13

signed by the Plaintiff in his capacity as Manager of SMP and by Defendant Doctor Michael Bruehl, in his capacity as President of SPC and as a physician owner.

Further, at the time of the Asset closing on October 24, 2013, the Plaintiff was presented with an authorization and the Second Amendment to the Asset Purchase Agreement.[13] (Pl.'s Supp. S.M.F. ¶ 60.) Said Amendment clearly indicated that the balance remaining in the escrow account would be released:

    i.    to Sunbury Primary Care P.A. upon a final resolution of the Claim, provided there is no liability, cost or expense to buyer that has not been fully satisfied by the undersigned Physician Owners; or

    ii.    to Buyer in the event any cost or expense paid or incurred by Buyer arising from the claim has not been fully satisfied by the undersigned Physician Owners.

The Second Amendment authorized the release of nearly all of the remaining escrow funds and satisfied the remaining personal liabilities of the assets. *Id.* Plaintiff signed both the Authorization and the Second Amendment in his capacity as manager of SMP and Doctor Doctor Defendant Bruehl signed in his capacity as President of SPC and as a physician owner.

Plaintiff's contention that he is not bound by the documents is not persuasive. It was Plaintiff's duty to read and understand the documents he was signing. "The law presumes, in the absence of fraud or imposition, that he did read it, or was otherwise informed of its contents, and was willing to assent to its terms without reading it." *Hix v. E. S.S. Co.*, 107 Me. 357, 78 A. 379, 381 (1910); *see also Francis v. Stinson*, 2000 ME 173, ¶ 42, 760 A.2d 209, 217-18

---

[13] The Authorization was drafted by Eaton Peabody and signed by the Plaintiff at closing. It states:

> Sunbury Medical Properties, LLC authorizes you to apply $372,774.16 of its funds currently held by Eaton Peabody in escrow to satisfy amounts due from and/or owed by Sunbury Primary Care P.A. at the asset closing being conducted on or about today's date and reflected in the seller settlement statement of even date. The balance of funds remaining in the escrow account being $14,756.04 shall remain in escrow in accordance with the Second Amendment to Asset Purchase Agreement of even date.

14

("As a matter of general contract law, parties to a contract are deemed to have read the contract and are bound by its terms.").

The terms of the First and Second Amendments to the Asset Purchase Agreement signed by the Plaintiff clearly set forth the intentions of the Doctor Defendants to apply the proceeds in escrow to outstanding debts of the SPC. Whether an asset of SPC was properly used to extinguish the debt of SPC and the Doctor Defendant guarantors is a valid question, but there was no disregard or misuse of the corporate form of the sort essential to the first element of piercing the corporate veil. All corporate steps necessary to complete the EMMC transaction, including the assignment of SMP sales proceeds, were properly approved and documented. Because the Plaintiff has failed to meet the first part of the test for piercing the corporate veil—that the Doctor Defendants "dominated, abused or misused the corporate form"—the second part of the piercing test need not be analyzed.

*ii. Doctor Defendants' Personal Liability for Their Own Acts and Omissions*

The Plaintiffs' claims against the Doctor Defendants fall into two groups.

Counts I through V of Plaintiff's Third Amended Complaint allege the following claims against the Doctor Defendants: Count I—Unjust Enrichment; Count II—Breach of Duty of Good Faith and Fair Dealing--31 M.R.S. §1522.F; Common Law; Count III—Breach of Contract; Count IV—Quantum Meruit; Count V—26 M.R.S. §§626-626-A. Counts VI through VIII allege tort claims against the Doctor Defendants. Each group is analyzed separately.

Count I—Unjust Enrichment: If the Doctor Defendants were unjustly enriched, it was at the immediate expense of SMP, because it was an asset of SMP that was used to extinguish their liability as guarantors on the debt of SPC to Katahdin.

15

One reasonable view of the facts is that the Doctor Defendants caused SMP to transfer proceeds of the sale of its real estate to satisfy a debt of a different entity that the Doctor Defendants had guaranteed; that they caused Plaintiff to cooperate in the transaction on the understanding that his claim would be addressed after the EMMC transaction had closed, and that, through inaction, they are now holding his claim in a state of limbo by failing either to make any distribution, or to dissolve SMP and distribute its assets, or to reimburse SMP for the proceeds diverted to benefit themselves, or to get SPC to reimburse SMP.

That interpretation of the facts means that Plaintiff has made a *prima facie* showing that he has conferred a benefit on the Doctor Defendants in the form of an expectancy, and that they knowingly took the benefit and used it to pay their own debt, and are refusing to take steps that they have the ability to take that are necessary for the benefit to be returned to the Plaintiff-- and therefore have been unjustly enriched at Plaintiff's expense. The Doctor Defendants' Motion for Summary Judgment is denied as to Count I. On the other hand, Plaintiff's showing is to a *prima facie* degree only, so his Motion is also denied.

Count II:  Breach of Duty of Good Faith and Fair Dealing—31 M.R.S. § 1522.F:  The cited statute, 31 M.R.S. § 1522.F. provides that an LLC may not "eliminate or limit a member's liability to the limited liability company and members for money damages for a bad faith violation of the implied contractual covenant of good faith and fair dealing." Nothing in the SMP agreement purports to do that.

However, the statute plainly is intend to establish a duty of good faith and fair dealing on the conduct of the business of SMP.  The court is not prepared to say that the Doctor Defendants' duty of good faith and fair dealing does not run in favor of Plaintiff, even though he is an economic interest holder rather than a member.  The same circumstances that Plaintiff proffers to support his unjust enrichment claim also suffice to make a *prima facie* showing of

16

breach of the duty of good faith and fair dealing. Summary judgment on Count II is denied to both the Doctor Defendants and the Plaintiff.

Count III—Breach of Contract: Plaintiff has not shown that the Doctor Defendants breached a contract between any of them and him. His Motion will be denied; theirs will be granted, as to Count III.

Count IV—Quantum Meruit: This count fails because the Plaintiff has not shown that he rendered services to the Doctor Defendants under circumstances in which the law implies a promise to pay. He was employed by SMP and SPC in various capacities, and his services were rendered to those entities, not to the individual Doctor Defendants. His Motion will be denied as to Count IV; theirs will be granted, as to Count IV.

Count V—26 M.R.S. §§626-626-A : This count is brought under the wage payment statute, which does not fit the circumstances of this case. Any entitlement Plaintiff might have to a distribution from the LLC is not within the scope of title 26. The employment agreement was executed between the Plaintiff and SPC, which is a registered professional services corporation. At no point did the Doctor Defendants personally employ the Plaintiff as an employee or as an independent contractor. His Motion will be denied as to Count V; theirs will be granted, as to Count V.

Counts VI through VIII allege tort claims against the Doctor Defendants. "Corporate officers who participate in wrongful acts can be held liable for their individual acts, and such liability is distinct from piercing the corporate veil." *Advanced Const. Corp. v. Pilecki*, 2006 ME 84, ¶ 13, 901 A.2d 189, 195 (citing *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir.1978)). "The individual liability stems from participation in a wrongful act, and not from facts that

must be found in order to pierce the corporate veil." *See Advanced Const. Corp. v. Pilecki*, 2006 ME 84 at ¶ 13, 901 A.2d at 195 (citing *Mariello v. Giguere*, 667 A.2d 588, 590-91 (Me. 1995).

Count VI—Tortious Interference: In Maine, to establish a claim for tortious interference with contractual relations, a plaintiff must prove the following: "(1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract or advantage through fraud or intimidation; and (3) that such interference proximately caused damages."[14] *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 31, 915 A.2d 400 (*quoting Rutland v. Mullen*, 2002 ME 98, ¶ 13, 798 A.2d. 1104). The expectancy here is the Plaintiff's alleged entitlement to a distribution from SMP's proceeds of sale.

Even assuming there is an entitlement, Plaintiff has not made a *prima facie* showing that any of the Doctor Defendants used fraud or intimidation to interfere with it. In telling him through their attorney that his claim would be "dealt with" after the EMMC transaction had closed, they were not promising to honor his claim. Because the Plaintiff has failed to set forth a *prima facie* case, the Doctor Defendants' Cross Motion will be granted as to Count VI.

Count VII—Fraudulent/intentional misrepresentation: To prove fraud, the Plaintiff must show by clear and convincing evidence:

(1) that [the Defendant] made a false representation (2) of a material fact[15] (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing plaintiff to act in reliance upon it, and (5) plaintiff[s] justifiably relied upon the representation as true and acted upon it to [their] damage.

---

[14] "Intimidation is not restricted to frightening a person for coercive purposes, but rather exists wherever a defendant has procured a breach of contract by making it clear to the party with which the plaintiff had contracted that the only manner in which that party could avail itself of a particular benefit of working with defendant would be to breach its contract with plaintiff."
*Currie*, 2007 ME 12, ¶ 31, 915 A.2d 400 (quoting *Pombriant v. Blue Cross/Blue Shield of Maine*, 562 A.2d 656, 659 (Me. 1989)) (citations omitted).
[15] "To be material, the false or fraudulent representation must 'not only influence the buyer's judgment in making the purchase but also must relate to a fact which directly affects the value of the property sold.'" *Mariello*, 667 A.2d at 590 (citing *Bolduc v. Therrien*, 147 Me. 39, 43, 83 A.2d 126, 129 (1951)).

18

*Mariello v. Giguere*, 667 A.2d 588, 590 (Me. 1995) (*citing Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me. 1992)).

In the Third Amended Complaint, the Plaintiff avers that the Defendant Doctors withheld information from the Plaintiff and were not willing to reimburse the Plaintiff for the loss of the benefit of his investment. (Compl. ¶¶ 116-118). Plaintiff has failed to make a *prima facie* showing that any of the Doctor Defendants misrepresented any material fact or fraudulently induced the Plaintiff into signing the documents authorizing SMP's proceeds of sale to be applied to satisfy debt of SPC. As noted above, they never promised to honor his claim if he cooperated in the EMMC transaction. Because the Plaintiff has failed to establish a *prima facie* case, the Doctor Defendants' Cross Motion is granted as to Count VII.

Count VIII—Negligent Misrepresentation: In Maine a party will be held liable for negligent misrepresentation "if in the course of his business he supplies false information for the guidance of others in their business transactions, and the other party justifiably relies upon it to his pecuniary detriment." *Guiggey v. Bombardier*, 615 A.2d at1173 (*citing Chapman v. Rideout*, 568 A.2d 829, 830 (Me.1990)); *see also* Restatement (Second) of Torts § 552.

Whether a party made a misrepresentation and whether the opposing party justifiably relied on a misrepresentation are questions of fact. *See McCarthy v. U.S.I. Corp.*, 678 A.2d 48, 53 (Me.1996); Devine v. Roche Biomedical Labs., Inc., 637 A.2d 441, 446 (Me. 1994). "Additionally, liability only attaches if, when communicating the information, the party making the alleged misrepresentation "fails to exercise the care or competence of a reasonable person under like circumstances," an inquiry that is likewise for the fact-finder." Rand v. Bath Iron Works, 2003 ME 122, ¶ 13, 832 A.2d 771.

Again, the Doctor Defendants through their attorney told Plaintiff only that his claim would be addressed after the EMMC transaction, not that it would be honored. This is not a

19

false statement, although it could enable Plaintiff to overcome the waiver defense that the Defendants assert based on his execution of the document assigning SMP's sales proceeds to satisfy SPC's debt, in that he did not knowingly intend to relinquish his right to a distribution. Defendants are entitled to summary judgment on Count VIII.

Conclusion

For the foregoing reasons, it is hereby ORDERED AND ADJUDGED:

1.  Plaintiff's Motion for Summary Judgment on Counts I through V of the Third Amended Complaint is denied.

2.  The Cross-Motion for Summary Judgment of Defendants Thomas Hayward, Ken Simone and Michael Bruehl is granted as to on Counts III through VIII of the Third Amended Complaint and denied as to Counts I and II.

Pursuant to M.R. Civ. P. 79, the clerk is hereby directed to incorporate this Order into the docket by reference.

Dated February 27, 2015

A. M. Horton, Justice
Business & Consumer Court

**David L. Savell v. Thomas D. Hayward, Kenneth G. Simone, Michael B. Bruehl, Michael A. Duddy and Kelly, Remmel & Zimmerman**
**BCD-CV-14-34**


**David L. Savell**
    **Petitioner / Plaintiff**

        Counsel:            Barry Mills, Esq.
                              Hale & Hamiln
                              PO Box 729
                              Ellsworth, ME 04605


**Thomas D. Hayward, Kenneth G. Simone**
    **Respondents / Defendants**

        Counsel:            James Haddow, Esq.
                              50 Monument Square
                              PO Box 17555
                              Portland, ME 04112-8555


**Michael A. Duddy and Kelly, Remmel & Zimmerman**
    **Respondents / Defendants**
        Counsel:            James Bowie, Esq.
                              Three Canal Plaza
                              PO Box 4630
                              Portland, ME 04112-4630

STATE OF MAINE                          BUSINESS AND CONSUMER COURT

Cumberland, ss.

DAVID L. SAVELL,
                         Plaintiff

                 v.                              Docket No. BCD-CV-14-34 ✓

THOMAS D. HAYWARD, KENNETH G. SIMONE,
MICHAEL B. BRUEHL, MICHAEL A. DUDDY
and KELLY, REMMEL & ZIMMERMAN,

                       Defendants

## AMENDED ORDER ON MOTION TO DISMISS

This Amended Order replaces and supersedes the Order on Motion to Dismiss dated June 16, 2014.

Defendants Duddy and Kelly, Remmel & Zimmerman ["the attorney Defendants"] have filed a Motion to Dismiss pursuant to M.R. Civ. P. 12(b)(6). Plaintiff opposes the motion.

The motion relies on several documents outside the pleadings, which the motion asks the court to consider without converting the motion into one for summary judgment. *See Moody v. State Liquor and Lottery Commission,* 2004 ME 20, ¶ 10, 843 A.2d 43, 48 ("official public documents, documents that are central to the plaintiff's claim, and documents referred to in the complaint [can be considered] without converting a motion to dismiss into a motion for a summary judgment when the authenticity of such documents is not challenged").

The Plaintiff's opposition correctly points out that, because this is a Rule 12(b)(6) motion, all material factual allegations in the complaint must be taken as true, including the allegation that Plaintiff was represented by the attorney Defendants. Plaintiff also points out that whom the attorney Defendants represented in connection with the transactions at issue is

1

a question of fact at least in part, and note that the attorney Defendants' filing does not include any documentation of whom the attorney Defendants represented in connection with the underlying transactions.

At a conference of counsel today, the motion was discussed, and the following additional points emerged:

- Plaintiff has a pending document request for the fee agreement(s) under which the attorney defendants provided legal services in connection with the entities and transactions mentioned in the complaint.

- Plaintiff intends to amend his complaint further in any event. Case law under Rule 12(b)(6) indicates that, even if the pending Motion to Dismiss were granted, the Plaintiff should be given leave to amend his complaint.

These additional points lead the court to conclude that, either the pending Motion to Dismiss should be converted into a summary judgment motion to enable the underlying facts to be developed further in the filings, or the motion should be denied, without prejudice to the renewal of the attorney Defendants' arguments in a different context. The court adopts the latter course.

IT IS ORDERED AS FOLLOWS:

1. The Motion To Dismiss of Defendants Duddy and Kelly Remmel and Zimmerman is hereby denied, without prejudice to the renewal of the same argument in a further motion.

2. The deadline for Defendants Duddy and Kelly Remmel and Zimmerman to answer or otherwise plead is enlarged to 10 days after service on their counsel of the Plaintiff's amended complaint.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this order

by reference in the docket.

Dated June 18, 2014

_____
A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 6-18-14
Copies sent via Mail ___ Electronically ✓

3

**David L. Savell v. Thomas D. Hayward, Kenneth G. Simone, Michael B. Bruehl, Michael A. Duddy and Kelly, Remmel & Zimmerman**
**BCD-CV-14-34**

**David L. Savell**
    **Petitioner / Plaintiff**

        Counsel:              Barry Mills, Esq.
                             Hale & Hamiln
                             PO Box 729
                             Ellsworth, ME 04605

**Thomas D. Hayward, Kenneth G. Simone**
    **Respondents / Defendants**

        Counsel:              James Haddow, Esq.
                             50 Monument Square
                             PO Box 17555
                             Portland, ME 04112-8555

**Michael A. Duddy and Kelly, Remmel & Zimmerman**
    **Respondents / Defendants**
        Counsel:              Pro-se.
                             PO Box 597
                             53 Exchange St.
                             Portland, ME 04112-0597

STATE OF MAINE                    BUSINESS AND CONSUMER COURT

Cumberland, ss.


DAVID L. SAVELL,
                    Plaintiff

              v.                                Docket No. BCD-CV-14-34 ✓

THOMAS D. HAYWARD, KENNETH G. SIMONE,
MICHAEL B. BRUEHL, MICHAEL A. DUDDY
and KELLY, REMMEL & ZIMMERMAN,

                    Defendants

                    ORDER ON MOTION TO DISMISS

Defendants Duddy and Kelly, Remmel & Zimmerman ["the attorney Defendants"]
have filed a Motion to Dismiss pursuant to M.R. Civ. P. 12(b)(6). Plaintiff opposes the
motion.

The motion relies on several documents outside the pleadings, which the motion
asks the court to consider without converting the motion into one for summary judgment.
*See Moody v. State Liquor and Lottery Commission*, 2004 ME 20, ¶ 10, 843 A.2d 43, 48 ("official
public documents, documents that are central to the plaintiff's claim, and documents referred to
in the complaint [can be considered] without converting a motion to dismiss into a motion for
a summary judgment when the authenticity of such documents is not challenged").

The Plaintiff's opposition correctly points out that, because this is a Rule 12(b)(6)
motion, all material factual allegations in the complaint must be taken as true, including the
allegation that Plaintiff was represented by the attorney Defendants. Plaintiff also points out
that whom the attorney Defendants represented in connection with the transactions at issue is
a question of fact at least in part, and note that the attorney Defendants' filing does not include

1

any documentation of whom the attorney Defendants represented in connection with the underlying transactions.

At a conference of counsel today, the motion was discussed, and the following additional points emerged:

- Plaintiff has a pending document request for the fee agreement(s) under which the attorney defendants provided legal services in connection with the entities and transactions mentioned in the complaint.

- Plaintiff intends to amend his complaint further in any event. Case law under Rule 12(b)(6) indicates that, even if the pending Motion to Dismiss were granted, the Plaintiff should be given leave to amend his complaint.

These additional points lead the court to conclude that, either the pending Motion to Dismiss should be converted into a summary judgment motion to enable the underlying facts to be developed further in the filings, or the court should simply exercise its discretion under the *Moody* decision to decline to consider the extrinsic documents on which the Motion to Dismiss relies.

The latter approach appears preferable, given that the current Motion to Dismiss might need to be revised as a result of the opportunity to amend the complaint to which the Plaintiff likely would be entitled, even were the Motion to Dismiss to be granted. Accordingly, the court declines to consider material extrinsic to the pleadings for purposes of the Motion to Dismiss. Considering the pleadings only, Plaintiff's current complaint plainly states a cognizable claim for attorney malpractice, so the Motion to Dismiss will be denied, without prejudice to the renewal of the attorney Defendants' arguments in a different context.

IT IS ORDERED AS FOLLOWS:

2

1. The Motion To Dismiss of Defendants Duddy and Kelly Remmel and Zimmerman is hereby denied, without prejudice to the renewal of the same argument in a further motion.

Pursuant to M.R. Civ. P. 79(a), the clerk is hereby directed to incorporate this order by reference in the docket.

Dated June 16, 2014

A. M. Horton
Justice, Business and Consumer Court

David L. Savell v. Thomas D. Hayward, Kenneth G. Simone, Michael
B. Bruehl, Michael A. Duddy and Kelly, Remmel & Zimmerman
BCD-CV-14-34


**David L. Savell**
      **Petitioner / Plaintiff**

        Counsel:                  Barry Mills, Esq.
                                   Hale & Hamiln
                                   PO Box 729
                                   Ellsworth, ME 04605


**Thomas D. Hayward, Kenneth G. Simone**
      **Respondents / Defendants**

        Counsel:                  James Haddow, Esq.
                                   50 Monument Square
                                   PO Box 17555
                                   Portland, ME 04112-8555


**Michael A. Duddy and Kelly, Remmel & Zimmerman**
      **Respondents / Defendants**
        Counsel:                  Pro-se
                                   PO Box 597
                                   53 Exchange St.
                                   Portland, ME 04112-0597